# WILLIAM MATTFELD v. EMIL NESTER.[1]

April 16, 1948.

Nos. 34,587, 34,588.

[1]Reported in 32 N. W. (2d) 291.

*Fowler, Youngquist, Furber, Taney & Johnson* and *C. A. Taney, Jr.,* for appellant.

*Dell & Rosengren,* for respondents.

PETERSON, JUSTICE.

Two appeals from orders denying defendant's motions in the alternative for judgments notwithstanding the verdicts for plaintiff or for new trials in two actions, which were tried together, one of which was brought by plaintiff as special administrator of the

estate of Lillian Mattfeld to recover damages for her wrongful death, and the other by him individually to recover consequential damages sustained by him as her husband as the result of the injuries from which she died.

Numerous questions have been raised by appellant. Some plainly lack merit. Those which merit discussion are:

(1) Whether plaintiff was guilty of contributory negligence was a fact question, where the evidence showed that on a clear day and dry road he approached an intersection in his automobile with his view more or less obstructed until he got to a point about 35 to 45 feet from the center thereof, where he could observe to his right the intersecting road to the top of a knoll about 6 feet high about 75 feet from the center of the intersection, but could not see beyond the knoll or any approaching traffic behind it; that there he looked to his right for approaching traffic and saw none; and, when he got past the center of the intersection, defendant, who came in his automobile from plaintiff's right over the knoll at a speed of about 40 miles per hour, collided with plaintiff's automobile without first seeing it and without slackening his speed;

(2) Whether, in a wrongful-death action, where issue is tendered as to whether plaintiff had been appointed as a special administrator of decedent's estate, of which fact plaintiff's counsel stated upon the trial he would furnish proof, but did not, and the trial proceeded to a verdict in favor of plaintiff upon the assumption that plaintiff had been so appointed and would supply proof of the fact, the trial court had the power to reopen the case after verdict to permit plaintiff to prove the fact of his appointment as special administrator by uncontroverted letters of special administration issued by the probate court having jurisdiction of decedent's estate;

(3) Whether this court will consider the question raised for the first time on appeal as to whether the special administrator of the estate of a decedent who during her lifetime brought an action to recover for personal injuries of which she afterward died is entitled to continue the action under M. S. A. 573.02 as one converted

by amendment into an action for wrongful death, where, although there is no order on file or of record authorizing him to continue the action, the trial court certifies that such an order was made;

(4) Whether the evidence supports a finding that an accident was the cause of death, where it shows that decedent received severe physical injuries and shock which necessitated her hospitalization for about three months; that she declined physically and mentally after the accident until her death from pneumonia about nine months afterward; and that a physician without objection gave an opinion that the accident was the cause of death;

(5) Whether it was prejudicial error to rule out questions on cross-examination asking a medical expert whether his opinion as to the cause of death was speculation, conjecture, or guesswork where the court indicated that it would permit full inquiry as to all matters going to the factual basis for the expert's opinion and the reasons therefor;

(6) Whether in a wrongful-death action the refusal of a requested cautionary instruction that plaintiff could not recover if the cause of decedent's death was speculative, conjectural, or unknown constituted an abuse of discretion where the general charge instructed the jury that its verdict must be based upon the evidence received in court;

(7) Whether, where a wrongful-death action in which defendant contends that the recovery, if any, should be reduced by the amount of the beneficiary's share thereof because the beneficiary's contributory negligence was a cause of the death, and an individual action by the beneficiary against the same defendant based upon the same alleged negligence in which defendant contends that the beneficiary is not entitled to recover because of his contributory negligence, are tried together, the trial court erred by refusing to submit in the wrongful-death action the question whether the beneficiary was guilty of contributory negligence and by adopting, in lieu of such submission, the general verdict in the beneficiary's individual action as a special finding with respect to the question;

(8)  Whether a husband who became personally liable for the expenses of his wife's burial is entitled to recover them in an individual action for consequential damages against a defendant causing her death;

(9)  Whether OPA ceiling prices on the selling price of used automobiles limit the amount the owner is entitled to recover for damage to his car caused by defendant's negligence; and

(10)  Whether a verdict for $9,000 for the death of a wife, mother, and homemaker is excessive under the facts set forth in the opinion.

These questions arise out of the facts which we now state.

Because the context shows whether the reference is to plaintiff in the wrongful-death action or to plaintiff in the individual action by William as husband, we do not deem it necessary to indicate whether particular references are to the one or the other.

On January 27, 1946, a collision occurred in the intersection of two graveled county roads between an automobile driven by William Mattfeld in which his wife, Lillian, was a guest passenger and one driven by defendant. We assume, for lack of proof to the contrary, that these roads were of the statutory width of 66 feet. The traveled portion of the east-west road was from 20 to 24 feet wide and that of the north-south road about 20 or 21 feet. The east-west road ran up and down over some slight knolls to a point about a quarter of a mile east of the north-south road, where it descended to the intersection. Along the right side, as one approached the intersection, there was a bank about 4 feet high and about 75 feet back a snow fence about 4 feet high, both of which extended parallel to the east-west road for about 150 feet and more or less obstructed the view of the north-south road. There was a knoll on the north-south road which rose to a height of about 6 feet 75 feet north of the center of the intersection. The west end of the snow fence was at a ditch on the east side of the road opposite the top of the knoll. The road dropped behind the knoll to such an extent that an automobile there could not be seen from the intersection.

As a driver approached the north-south road from the east, as William did, there was a place about 330 feet and another about 200 feet east of the intersection where a view could be had of the north-south road. At the northeast corner of the two roads, which was on a line directly south of the west end of the snow fence and about 20 feet east of the traveled portion of the north-south road, the driver of an automobile approaching the intersection from the east had a view to his right of the north-south road for about 75 feet to the top of the knoll.

Just before the accident, William (plaintiff) had been driving about 30 or 35 miles per hour and slackened his speed as he got near the intersection to about 20 to 24 miles per hour. At that time, an automobile driven by Ellsworth Zitzow had been ahead of him, but had crossed the road to the Zitzow mailbox on William's left near the intersection. William sounded his horn continuously to warn Zitzow of his approach. When William got to the corner he looked to the north past the end of the snow fence. He saw no automobile approaching from that direction. He then continued across the intersection, and when he got into the northwest part of the intersection of the traveled portions of the roads defendant's car collided with William's with such terrific force that it was raised several feet into the air, rolled over, and ultimately came to rest over 100 feet west of where the collision occurred. William's car was demolished. He did not again look to the north after making his observation at the corner until just before the collision occurred, when he saw defendant's car approaching about 20 feet away. Defendant did not see William's car at all before the collision occurred. Apparently, both William and defendant were familiar with the intersection and regarded it as a dangerous one. A witness driving a car about 500 feet behind William testified that William was going between 35 and 40 miles per hour as he entered the intersection; that defendant was going about 40 miles per hour as he came down to the intersection from the top of the knoll; that he did not slacken his speed before the collision; that both were about the same distance from the intersection when he first saw them;

and that he could tell better the speed of defendant's car than William's because he had a side view of the former and a rear view of the latter.

Lillian sustained a fracture of the surgical neck of the femur, a bruise and swelling in the temporal region of the head, and shock. She was taken to a hospital in Perham, where the fracture was set and where she subsequently was under the care of Dr. J. J. Warner, her family physician. While in the hospital, X rays were taken and numerous tests were made, such as those of the urine, for hemoglobin, and others. These tests disclosed nothing out of the ordinary, except the occasional presence of pus in the urine, which could be attributed to possible tonsil infection. While she was in the hospital she complained of severe pain and showed mental disturbance. On April 27, 1946, she was discharged from the hospital. Dr. Warner testified that at that time her physical condition was good, except for the fracture, by which he meant that her temperature and pulse and the laboratory findings as to her condition were normal and that she ate and slept well. Lillian was in a weakened condition when she arrived home. From the time she got home until her death she was unable to stand or walk alone and was confined either to her bed or to a wheel chair.

Prior to the accident, Lillian had been a strong, robust woman in good health and of cheerful disposition, who not only performed all the work and duties of a wife, the mother of five daughters, two of whom were under age, and a homemaker, but also helped in the field with such work as keeping a garden, shocking corn and grain, picking corn and potatoes, and helping with chores. At the time of her death she was 54 years old and had an expectancy of 18.09 years. Her husband was 56 years old. From the time of Lillian's return home from the hospital until she was taken to the hospital in St. Paul on September 30, 1946, she declined physically and mentally. Prior to the accident she weighed about 140 pounds. After she left the hospital in Perham she weighed about 110 pounds. As one witness said, she languished. On August 15, Dr. I. E. Bigler of Perham was called. He made a tentative diagnosis and con-

cluded that she might have had neuritis, a nerve injury, a spinal cord injury, or injury to the brain, and on September 30, 1946, he sent her to the hospital in St. Paul for orthopedic and neurological examinations by specialists in those fields. On October 14, she was returned to the Perham hospital in a comatose condition, where she died on the following day. Dr. Warner, who saw her at the hospital, testified that she had "gone down hill" after April 27, when she left the hospital.

During her lifetime, Lillian commenced an action against defendant to recover for personal injuries, and William commenced one to recover for his own personal injuries, property damages to his automobile, and consequential damages for loss of services and consortium sustained by him as her husband and the expenses he was put to in treating, caring for, and nursing Lillian as the result of her injuries. After Lillian's death, according to a certificate of one of the judges of the court below, the court, pursuant to M. S. A. 573.02 (see, Clay v. C. M. & St. P. Ry. Co. 104 Minn. 1, 115 N. W. 949; Anderson v. Fielding, 92 Minn. 42, 99 N. W. 357, 104 A. S. R. 665), granted the motion of William as special administrator of Lillian's estate to substitute him as plaintiff in the pending personal injury action commenced by her and by amendment to convert it into a statutory action for her wrongful death.

On the appeal, defendant claimed for the first time that William was not entitled to continue the prosecution of Lillian's personal injury action as one for her wrongful death for lack of a court order authorizing him to do so. No such order is in the files, and no record thereof appears. After the trial the clerk certified that there was no such order or record, and the Honorable Rol E. Barron, one of the judges of the court below, certified that at the opening of the 1946 term of the court he heard the motion by William as special administrator to substitute him as plaintiff in Lillian's action for personal injuries and by amendment to convert it into one for her wrongful death, and that he granted the motion. Correspondence between counsel showed that such an order had been made. Defendant's counsel admitted service of the amended complaint making

the conversion by amendment, and thereupon the action proceeded to trial without objection as one by William as special administrator of Lillian's estate to recover for her wrongful death.

In the answer to the amended complaint, defendant denied the allegation therein that William had been appointed special administrator of Lillian's estate. At the trial, defendant objected to the question whether William had been appointed special administrator of Lillian's estate, upon the ground that it was "not the best evidence." Without taking a ruling, plaintiffs' counsel stated that he would "supply that." Thereupon the trial proceeded the same as if William had been appointed special administrator of Lillian's estate. Plaintiffs' counsel failed to supply a certified copy of letters or other proof that William had been appointed special administrator of Lillian's estate. Notwithstanding this omission, defendant made numerous requests to charge, and the trial court without objection submitted the case upon the supposition that William had brought the action as special administrator of Lillian's estate. There was no motion to dismiss at the close of plaintiffs' case, but there was one for a directed verdict at the close of all the testimony. Failure to supply the certified copy of the letters or other proof of William's appointment as special administrator was not assigned as a ground of the motion or in any other way referred to. After verdict, however, defendant claimed that because of the omission he was entitled to judgment. Then, to cure the omission, William procured a certified copy of his appointment as Lillian's special administrator prior to the conversion of Lillian's personal injury action into one for her wrongful death and moved to be allowed to file the letters *nunc pro tunc* with the same effect as though received during the trial. The motion was granted.

Proof that the accident caused Lillian's death consisted of an opinion to such effect by Dr. Bigler, who testified that in 1939 he graduated from the College of Medicine of the University of Minnesota; that after spending a year as an intern he practiced medicine continuously, spending four and one-half years in the Army Air Corps, where he had considerable experience with wounded and in-

jured men; and that in his opinion, which was given without objection, the accident was the cause of death. He stated that he assumed that the injuries received by Lillian were those already mentioned; and that she declined physically and mentally, as the lay witnesses testified. Based on such assumption, it was his opinion that the accident caused her death. He stated that the terminal or direct cause of death was lobar pneumonia, and that this in turn was caused by her injuries, which caused her to decline physically to a point where pneumonia set in, as it often does in such cases, and caused her death.

On cross-examination he stated that when he sent her to the Miller Hospital he did not *know* what was the matter with deceased; that he sent her there for further diagnosis and attention; that, while he had made no clinical tests of her blood or urine or any others to determine whether she had a cancer, the facts assumed furnished an adequate basis for his opinion. In the course of his cross-examination he was asked directly in several different ways whether or not his opinion was a speculation, conjecture, or guess, but these were all ruled out upon objection. He testified that his opportunities to observe Lillian and to make various tests furnished an adequate basis for his opinion as to the cause of death. He was not asked to explain scientific or medical facts or doctrines which he applied to the assumed facts in coming to his conclusion; nor was any attempt made to show what such facts or doctrines were, much less that, if they were applied to the assumed facts, they would not show that the accidental injuries were not the cause of death. The trial court made it clear to defendant that he could pursue any inquiries concerning specific factors that ought to be considered by a medical expert in forming an opinion as to the cause of death. When defendant inquired of the doctor whether, if he wanted "to know the true answer," he ought to take into consideration "other factors in addition to the ones that were contained in the hypothetical question," an objection to the question was made, and the court thereupon inquired, "Why don't you ask him about the other things," and counsel replied, "All right. I was coming to that if I

could." But he never did. Defendant offered no medical evidence either to contradict that given by Dr. Bigler or to show what caused death.

At the trial, plaintiff in both actions was permitted to amend his complaints so as to delete from the complaint in the wrongful-death action allegations for recovery of burial expenses amounting to $240, and to add to the one in the action brought by him individually as husband allegations to the effect that by reason of the injuries and death of the wife he expended $240 for her burial, the reasonable value thereof.

The trial court denied a request in the wrongful-death case to submit for special finding the question whether William was guilty of contributory negligence, and, if he was, to deduct one-third of any recovery. Instead, the court decided that if the jury found for plaintiff in the wrongful-death case and against him in the individual action it would deduct from the recovery in the wrongful-death action one-third thereof as William's share, upon the theory that implicit in such verdicts would be a finding that he was guilty of contributory negligence. The reason given for the procedure adopted was that it would accord to defendant his rights with respect to the question and at the same time would be simple as a procedural matter.

Upon objection by plaintiff, the court ruled out defendant's offer to show that the OPA ceiling price for the same kind of car as William's was less than the damages thereto claimed by him.

The court denied an instruction, requested by defendant, to the effect that a verdict could not be returned for plaintiff if the cause of Lillian's death was speculative, conjectural, or unknown. An instruction, which has been in no way challenged either below or here, was given to the effect that plaintiff had the burden of proving the facts upon which he based his right of recovery, including the fact that the accident caused Lillian's death; that the verdict must be based upon the evidence received in court; and that the value of the medical expert's opinion that death was caused by the acci-

dent depended upon his knowledge, training, and experience with respect to the matters concerning which he testified.

1. Under M. S. A. 169.20, the driver of an automobile approaching an intersection is required to yield the right of way to a vehicle that has entered the intersection from a different highway, and when two vehicles enter an intersection at approximately the same time the driver approaching from the left is required to yield the right of way to the one approaching from the right. Automobiles enter an intersection at approximately the same time when they approach it under such circumstances that there would be imminent hazard of collision if both continued in their courses at the speeds at which they are traveling. Hence, an automobile approaching from the left is under the duty of yielding the right of way to one approaching from the right where they approach the intersection under such circumstances that if both continue at the speeds at which they are traveling a collision is likely to occur; and an automobile approaching from the right is required to yield the right of way to one approaching from the left which has reached the intersection an appreciable length of time ahead of it and is in actual possession of the intersection. Moore v. Kujath, 225 Minn. 107, 29 N. W. (2d) 883. The right-of-way rule is a relative one; whether it was violated depends on circumstances and usually is a fact question for the jury. Jeddeloh v. Hockenhull, 219 Minn. 541, 18 N. W. (2d) 582. We think that here the evidence presented a fact question as to whether William or defendant had the right of way, and whether, if William had it, he exercised it with due care. According to William's testimony, he looked to his right when he was where he could see past the west end of the snow fence, which was about 35 to 45 feet east of the center of the intersection. From the point of observation, he could see whether traffic was approaching on the north-south road between the intersection and the top of the knoll, a distance of about 75 feet, but not beyond. He saw no automobile approaching. It then appeared safe for him to cross. Then he proceeded into the intersection at about 20 to 24 miles per hour, and after he had gone about 40 to 50 feet defend-

ant's automobile collided with his. If, as William claims, he looked to his right and defendant was not then in view, and if he was going at the speed mentioned and defendant was going about 40 miles per hour, the evidence permitted a finding not only that William reached the intersection an appreciable length of time ahead of defendant, but also that he was in actual possession of it when defendant was back of the knoll, and that while William was in the intersection defendant came from behind the knoll and collided with him.

The evidence also presented fact questions as to whether William made a reasonable observation before entering the intersection and exercised due care after he got there. Ordinarily, where the defendant is out of sight of the driver crossing an intersection, as where defendant is behind an obstruction or in a dip of the road and it appears to plaintiff as a result of observation that it is safe to cross and would be but for defendant's unanticipated speed or other negligence, the question whether plaintiff was guilty of contributory negligence is one of fact for the jury. Dahl v. Collette, 206 Minn. 604, 289 N. W. 522. And where plaintiff has made a reasonable observation before crossing, he is not guilty of contributory negligence as a matter of law for failing to make additional observations. Jeddeloh v. Hockenhull, 219 Minn. 541, 18 N. W. (2d) 582, *supra.*

Under the circumstances, a driver approaching this intersection as William did could hardly have exercised more care for his own protection. What more could he do than ascertain that the intersection was clear and that no automobiles were approaching within the range of his vision? Certainly, he could not be expected to stop, get out of his car, and go to the top of the knoll to reconnoiter before proceeding. As Mr. Justice Cardozo pointed out in Pokora v. Wabash Ry. Co. 292 U. S. 98, 104, 54 S. Ct. 580, 582, 78 L. ed. 1149, 1154, 91 A. L. R. 1049, where plaintiff was hurt in a railroad grade-crossing collision under circumstances where plaintiff's vision was obscured, that would involve not only "uncommon precaution," but also one "very likely to be futile, and sometimes even dangerous." See, Polchow v. C. St. P. M & O. Ry. Co. 199 Minn. 1,

6, 270 N. W. 673, 675. It must be clear that by the time William could get back into his car and get it started after such reconnoitering he might be confronted by the very danger he encountered here. The only other alternative that suggests itself would have been for him to turn right at the intersection, proceed to the top of the knoll to ascertain whether cars were approaching from behind it, then negotiate a U turn in the north-south road, proceed back to the east-west road, and turn right on it. It is hardly necessary to say that to require such caution is absurd. In the final analysis, William was required to exercise ordinary care for his own safety, and under the circumstances here it was a question of fact whether he did. As said in the Pokora case (292 U. S. 106, 54 S. Ct. 583, 78 L. ed. 1155, 91 A. L. R. 1049): "* * * what is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury."

Defendant's argument to the contrary makes two untenable basic assumptions, viz., that plaintiff did not look to his right until he got to the east line of the traveled portion of the north-south road, and that by mathematical calculation based upon that assumption William's contributory negligence was demonstrable. It is clear from William's testimony that he made his observation at the point where he could see past the end of the snow fence, which was at least 20 feet, and probably about 35 feet, east of the east line of the traveled portion of the north-south road. Also, the distances and speeds shown by the testimony were only estimates of the witnesses. They afforded no basis for mathematical demonstration. As said in Ranum v. Swenson, 220 Minn. 170, 175, 19 N. W. (2d) 327, 330:

"* * * 'In automobile collision cases this court has adopted a policy of hesitation when contributory negligence as a matter of law is attempted to be found on estimates.' "

The jury's finding that William was not guilty of contributory negligence is sustained by the evidence.

2. Procedural law should be and is flexible enough to enable courts to make matters of procedure yield to the manifest demands of justice. Upon plaintiff's motion to include in the record as part

of his case a certified copy of the letters of special administration, the only objection by defendant was that the court lacked power after verdict to receive them. The letters, having been issued by a court having jurisdiction, were conclusive evidence of the due appointment of William as special administrator of Lillian's estate. Morin v. St. P. M. & M. Ry. Co 33 Minn. 176, 22 N. W. 251. If the letters had been received in evidence upon the trial, plaintiff would have been entitled to a peremptory instruction to that effect. And if that had been done, plaintiff's capacity to maintain the wrongful-death action would have been shown. M. S. A. 573.02; Jones v. Minnesota Transfer Ry. Co. 108 Minn. 129, 121 N. W. 606. While it is true, as defendant argues, that, because the office of an amendment *nunc pro tunc* is to supply a record of judicial action previously taken and not to supply judicial action itself (Wilcox v. Schloner, 222 Minn. 45, 23 N. W. [2d] 19), and because the copy of the letters of special administration was not offered and received upon the trial, it was not permissible by an amendment *nunc pro tunc* to say that the letters had been so offered and received. That is not exactly what the trial court held. It held that, while the letters were not offered and received upon the trial, they could be received upon the motion with the same effect as if they had been received during the trial. While this was labeled an amendment *nunc pro tunc*, it was in substance a reopening of the case to supply proof of a document which could not be controverted and which spoke for itself.

M. S. A. 544.32 provides that the court for good cause shown may supply any omission in any proceeding or record. Independent of statute, courts have such power as an inherent one. Where, as here, the omission relates to a fact provable by a document of an indisputable and incontrovertible nature, the adverse party is denied no right by reopening and receiving such proof, because even upon the trial the court would have been bound to peremptorily instruct the jury that the document spoke for itself and that the jury had nothing to determine with respect to the facts to which the document related. Here, the certified copy of the letters of special administration

proved as a matter of law William's appointment as such, and if the letters had been received upon the trial he would have been entitled to a peremptory instruction to that effect. Furthermore, the interests of justice require that the proof be received and that the litigation be ended. Courts, both trial and appellate, in order to prevent the miscarriage of justice resulting from a retrial, for the purpose of proving a fact the existence of which can be conclusively established by an indisputable and incontrovertible document, have the power to reopen the case to receive such proof even after verdict, and will exercise the power to sustain a verdict or judgment where the omission was caused through inadvertence or mistake of counsel for the prevailing party in failing to offer the proof upon the trial. Bank of Charleston v. Emeric, 2 Sandf. (N.Y.) 718; Prescott-Phoenix Oil & Gas Co. v. Gilliland Oil Co. (Tex. Civ. App.) 241 S. W. 775; 64 C. J., Trial, § 184; see, Meserve v. Folsom, 62 Vt. 504, 20 A. 926. The rule applies also where the case is tried by the court and decision is announced before the omitted evidence is offered. Riverside Portland Cement Co. v. Masson, 69 Or. 502, 139 P. 723, Ann. Cas. 1916A, 127.

In the Bank of Charleston case, plaintiff having failed to prove its incorporation, a fact put in issue by defendant the same as William's appointment as special administrator of Lillian's estate was put in issue here, defendant there moved for a nonsuit and, after verdict for plaintiff, for a new trial upon the ground that plaintiff's capacity to sue was not shown because of its failure to prove that it was a corporation. On the hearing of the motion for a new trial, plaintiff was permitted to read in evidence an exemplified copy of plaintiff's incorporation under an act of South Carolina. In holding that under the circumstances proof of plaintiff's incorporation was a mere formal matter and that such proof could be received after verdict, the court said (2 Sandf. [N.Y.] 719) :

"We think they have a right to produce it at the argument. It ought, no doubt, to have been proved at the trial, and the omission to require it on the part of the judge, was erroneous; but it is a well-settled and useful practice, in respect of documents which

speak for themselves, and on which no questions can arise except such as are apparent on their face, to permit them to be produced on the argument, when they have been inadvertently or unadvisedly omitted at the trial. As, for example, the record of a judgment, when the execution only was produced at the trial. If it be apparent that there is any surprise upon the adverse party, or that there was or is any point in his case which is prejudiced, or has been weakened by the omission of the evidence at the proper time, it will not be received at the argument. But it is surely not worth while to send this cause back for another trial, merely to have this document, on which no question arises, given in evidence."

As a matter of reason and common sense, the rule could not be otherwise.

Although the power of appellate courts is more circumscribed than that of trial courts by the rule that an appeal must be decided solely upon the evidence produced in the trial court and shown by the record on appeal, appellate courts, in order to sustain verdicts and judgments, will permit omissions to be supplied by documentary evidence of a conclusive nature. Annotation, 9 Ann. Cas. 953; 5 C. J. S., Appeal and Error, § 1523; 3 Am. Jur., Appeal and Error, § 835, notes 20 and 1. As said in the leading case of Dunham v. Townshend, 118 N. Y. 281, 286, 23 N. E. 367, 368:

"* * * On the argument in this court the respondent produced a certified copy of the judgment-roll. The appellant objects to its reception on the ground that it is improper for this court to act upon information thus obtained. While the production of record evidence is never allowed in an appellate court for the purpose of reversing a judgment[2] it is sometimes permitted for the purpose of sustaining a judgment. * * * This has frequently been decided in respect to records of judgments, exemplification of bankrupt discharges, certificates of naturalization, etc. * * * Evidence of this character is received by the appellate court for the reason that,

[2]We so held in Moose v. Vesey, 225 Minn. 64, 29 N. W. (2d) 649, with respect to inconclusive and controvertible documents such as a plat not received in evidence.

being in its nature incontrovertible, it would be idle to send the case back for a new trial for the sole purpose of admitting it. We think we may therefore receive and examine the judgment-roll, * * * *."

There was no error in permitting plaintiff after verdict to prove his appointment as special administrator.

3. Questions not presented for decision in the trial court will not be considered on appeal. Edelstein v. D. M. & I. R. Ry. Co. 225 Minn. 508, 31 N. W. (2d) 465. Defendant having failed to raise any question in the trial court concerning irregularity, if any, concerning the alleged lack of a court order authorizing William as special administrator to convert Lillian's personal injury action into one for her wrongful death, the question will not be considered here on appeal.

4. The evidence sustains a finding that Lillian's death was caused by the collision. It showed that her injuries were so severe that she was hospitalized for about three months; that she left the hospital in a weakened condition; that she declined continuously physically and mentally from the time of the accident until her death nine months later; that pneumonia was the "terminal" cause of death; that the pneumonia resulted proximately from the injuries caused by the accident; and that, while the doctor could not say positively that the accident caused her death, it was his opinion that it did. The applicable rule is aptly stated in Annotation, 79 A. L. R. 351, et seq., where numerous cases involving its application are discussed, as follows:

"It may be generally stated that an injury is held to be the proximate cause of death where disease intervened, when it is shown that the injury caused the disease from which death resulted; or, if the injury did not cause the disease, that it concurred with the disease as a direct agent in producing death, and without which death would not then have resulted; provided, in either case, there was no intervening act or neglect of the decedent or a third person which contributed to the fatal result."

It is the rule followed by us in numerous cases collected in 2 Dunnell, Dig. & Supp. § 3327. We applied it in Anderson v. Anderson, 188 Minn. 602, 248 N. W. 35, which is indistinguishable from the instant case, where we held that an accident causing injuries from which pneumonia ultimately resulted, causing death, was the proximate cause of death. Loveless v. Red Top Cab Co. 158 Wash. 474, 291 P. 344, 79 A. L. R. 347, is in accord. The reasons for the rule are well explained in Keegan v. M. & St. L. R. Co. 76 Minn. 90, 91, 78 N. W. 965, where deceased died of rheumatism resulting from an ankle injury caused by defendant's negligence. Mr. Justice Mitchell speaking for the court said:

"* * * In accordance with the decisions of this, as well as of most, if not all, other courts, if the injury proximately caused the rheumatism, then the injury was a proximate cause of the death. * * * Consequences which follow in an unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original wrongdoer is responsible, even though he could not have foreseen the particular results which did in fact follow."

The opinion of a physician based on all the facts mentioned is evidence supporting the finding as to the cause of death. As said in Industrial Service Co. v. State, 176 Md. 625, 6 A. (2d) 372, if an expert's opinion could not be received to show the cause of death under circumstances of a case like the instant one, it would be hard to imagine a case where such an opinion could ever be used. It is not necessary that a medical expert's opinion be capable of demonstration or that he speak with confidence excluding all doubt; it is enough that he state that his opinion is in his judgment true. Hiber v. City of St. Paul, 219 Minn. 87, 93, 16 N. W. (2d) 878, 881.

The case of Mageau v. G. N. Ry. Co. 106 Minn. 375, 119 N. W. 200, is different. In that case there was an intervening childbirth between the accidental injury and death, and there were no established facts showing whether death resulted from peritonitis caused by the accidental injury or from septicemia resulting from infection occurring at the time of the childbirth. We held that the

doctors could not ascertain whether decedent died of peritonitis without a post-mortem or microscopic examination; and that because that fact had not been so ascertained there was no basis for the doctors' opinions that death was caused by peritonitis, which in turn was caused by the accidental injury. That case has no application here.

5. It was not error to rule out questions put to Dr. Bigler as to whether his opinion was speculative, conjectural, and guesswork. Before those questions were asked, Dr. Bigler's opinion that the accident was the cause of death had been received without objection. This is the customary practice. "A physician is generally conceded to be a qualified expert witness as to the cause of death, even though without experience." Palmer v. Order of U. C. T. 191 Minn. 204, 205, 253 N. W. 543. After an expert's opinion has been properly received, as here, cross-examination is for the purpose of testing the weight of his testimony. Richards v. Watson Flagg Eng. Co. 109 N. J. L. 128, 160 A. 500; Rogers, Expert Testimony (3 ed.) § 62, p. 123.

Generally, a wide range of inquiry should be allowed on cross-examination. But the manner and scope thereof rest largely within the discretion of the trial court, the exercise of which constitutes no ground for reversal except in cases of clear abuse thereof. Schaedler v. New York L. Ins. Co. 201 Minn. 327, 276 N. W. 235; Ivanesovich v. North American L. & C. Co. 145 Minn. 175, 176 N. W. 502.

The object of all examination of witnesses, both direct and cross, is to elicit facts to show the truth. So long as cross-examination serves that purpose, it should not be restricted, but when it does not it should be stopped. Schuh v. Oil Well Supply Co. 50 Cal. App. 588, 195 P. 703; Roe v. State, 96 Fla. 723, 119 So. 118. For example, it would have been permissible here to elicit by cross-examination of Dr. Bigler any facts showing his bias, prejudice, and interest, if any; the basis, extent, and other matters concerning his knowledge of causes of death in cases like the instant one; the scientific basis, or lack of it, for any medical facts or rules which he used in making an inference from the facts upon which

he based his opinion that the accident was the cause of Lillian's death; the particular application of such medical facts and rules to the facts of the instant case; the existence of the facts concerning Lillian's injuries, illness, and condition to which he testified and which formed part of the predicate for his opinion; his experience and ability to apply the medical facts and rules to the instant case; and the like. See, Palmer v. Order of U. C. T. *supra*. The trial court made it clear that such inquiries might be pursued.

Argumentative questions not only fail to elicit facts and to contribute to the ascertainment of truth, which is the only justifiable purpose of inquiry, but also they invade the province of the jury, which is to determine the facts. For example, it has been held that it is not permissible to ask a witness on cross-examination whether he is "guessing" (Burrowes v. Skibbe, 146 Or. 123, 29 P. [2d] 552); whether he swore to something he knew nothing about (Lincoln Reserve L. Ins. Co. v. Armes, 215 Ala. 407, 110 So. 818); whether he considers himself as an expert as good a judge of the matter in dispute as other experts testifying in the case (Haverhill Loan and Fund Assn. v. Cronin, 86 Mass. [Allen] 141); whether his testimony is untrue (Scott v. Dow, 162 Mich. 636, 127 N. W. 712); and the like. Likewise, a question as to whether an expert's opinion is "speculative" contributes nothing to the inquiry, because the witness may by his answer label his opinion as "speculative," when it is not so in any legally objectionable sense, as where it rests upon factual predicate and scientific deduction. Hiber v. City of St. Paul, 219 Minn. 87, 16 N. W. (2d) 878, *supra*.

Here, defendant pursued to a limited extent the avenues of inquiry open to him. He inquired of the doctor whether an examination of the X rays taken of Lillian while she was in the hospital would not have better enabled him to give an opinion; whether a post-mortem or microscopic examination (see Mageau v. G. N. Ry. Co. 106 Minn. 375, 119 N. W. 200, *supra*) was necessary to enable him to give an opinion; and whether the facts in evidence constituted an adequate predicate for an opinion. The doctor testified that, while the X rays and the microscopic and post-mortem

examinations would have been helpful, they were not necessary, and that without them there was adequate basis for his opinion. The doctor was also asked whether he considered cancer as a cause of death. He testified that he did, and eliminated it as such. The inquiry was not pursued far enough to show whether the doctor had adequate reasons for doing so, and whether cancer was a factor that rendered his opinion as to the cause of death untrustworthy. The facts upon which the opinion was based were practically undisputed. The cross-examination did not touch upon the doctor's knowledge, skill, or experience; the verity of the medical facts or rules he used in making his inferences; or the reasonableness of the inferences themselves.

6. The refusal to charge that no verdict in the wrongful-death action could be returned for plaintiff, if the cause of Lillian's death was speculative, conjectural, or unknown, was not error, for the reasons that the charge given not only adequately submitted the questions for the jury's determination, but also negatived any basis for a recovery for plaintiff, if the cause of death was speculative, conjectural, or unknown. As we have just pointed out, the doctor's knowledge, experience, and skill, the facts forming the predicate for his opinion, and the medical facts or rules used by him in making his inferences stood practically undisputed. On top of all this, the doctor was in no way contradicted. That being true, whatever else might be thought of the doctor's opinion, it was not speculation or conjecture (Hiber v. City of St. Paul, *supra*), or guesswork (Sharp v. Missouri Pac. Ry. Co. 213 Mo. 517, 111 S. W. 1154). In the latter case the court said (213 Mo. 531, 111 S. W. 1157):

"* * * If a man, well to-day, is badly injured and from that time on sickens (with symptoms referable to his injury), and, languishing, finally dies, a disagreement among doctors as to the name of the disease on him at the moment of dissolution, does not create a condition from which it can be said that a verdict one way or the other is merely *guess work*—a wild goose chase into the field of chance and *conjecture*." (Italics supplied.)

The predicate for the doctor's opinion here was established by testimony which the jury could not ignore. The witnesses testifying as to Lillian's condition were apparently of good character, and their testimony was positive, consistent, probable, unimpeached, and uncontradicted. Under the rule of O'Leary v. Wangensteen, 175 Minn. 368, 221 N. W. 430, the jury would not have been justified in rejecting such testimony. Because the doctor's opinion was not so positive as to exclude all doubt as to cause of death, the weight of his opinion was for the jury. Hiber v. City of St. Paul, *supra*.

The charge given instructed the jury that plaintiff could not recover unless Lillian's "death was the proximate result of that accident" and the accident was proximately caused by defendant's negligence; that the case was to be decided upon the "actual evidence"; that plaintiff had the burden of proof; and that—

"Opinion evidence is simply the opinion of a witness and it comes before the jury for whatever assistance it may afford the jury in its consideration of all of the evidence in the case. When you have opinion evidence before you you will naturally consider and determine the value of that opinion. In other words, you will ask who is giving that opinion? What does he or she know about the circumstances of that kind? What was his or her training? What has been his or her experience? Such a witness may express an opinion about something that he perhaps has some definite knowledge of, yet the weight to be given to the opinion is entirely for the jury to determine, and if you find it is entitled to no weight you may disregard it. But if you find it entitled to weight you will give it such weight in your deliberations as you feel it is justly entitled to."

The part relative to the opinion evidence follows the rules laid down in Moratzky v. Wirth, 74 Minn. 146, 76 N. W. 1032.

No objections having been taken to these portions of the charge, they became the law of the case under the rule that instructions unobjected to at the trial or on motion for a new trial, whether correct or erroneous, become the law of the case both in the trial and in the appellate court. Novotny v. Bouley, 223 Minn. 592, 27 N. W.

(2d) 813; Katzmarek v. Weber Brokerage Co. 214 Minn. 580, 8 N. W. (2d) 822; Fidelity & Casualty Co. v. Minneapolis Brg. Co. 214 Minn. 436, 8 N. W. (2d) 471; Anderson v. Hegna, 212 Minn. 147, 2 N. W. (2d) 820; 6 Dunnell, Dig. & Supp. § 9792.

An instruction that the jury may not base its verdict upon speculation, conjecture, guesswork, and the like is cautionary in nature. Generally, whether a cautionary instruction should be given rests in the sound discretion of the trial court. State v. Jenkins, 171 Minn. 173, 213 N. W. 923. Whether the exercise of such discretion in the particular case constituted an abuse thereof is to be determined by whether there was seeming necessity for the caution. 53 Am. Jur., Trial, § 610. Here, there was no such necessity for the cautionary instruction requested. The general charge that the jury should base its verdict upon "actual evidence" received in court excluded by implication, as clear as though it expressly so stated, any notion that the jury might return a verdict for plaintiff if the cause of Lillian's death was speculative, conjectural, or unknown. In Sordelett v. Mercer, 185 Va. 823, 829, 40 S. E. (2d) 289, 291, there was a general instruction that plaintiff had the burden of proof and that the jury should base its verdict upon the law and the evidence. There was also a cautionary instruction against basing the verdict upon speculation and sympathy, which was challenged on appeal. The court held that whether the cautionary instruction should have been given was a matter of discretion, but that under the circumstances, which were the same as here, there was no necessity for the caution, and said:

"* * * It correctly informed the jury as to the burden of proof and then cautioned them as to basing their verdict on *speculation* or sympathy. Generally, where a jury have been told to base their verdict on the evidence and the law, it is needless to tell them not to base it on something else, but no harm resulted here from doing so." (Italics supplied.)

Our conclusion is that the instructions given adequately submitted the case. They not only required recovery to be predicated upon proof as a fact that Lillian's death was caused by the acci-

dent, but also excluded all right to recover if such cause was speculative, conjectural, or unknown.

7. Where the negligence of one of several beneficiaries contributed to the death, recovery in an action for wrongful death may be denied to the extent that it would inure to the one guilty of contributory negligence. Luck v. Minneapolis St. Ry. Co. 191 Minn. 503, 254 N. W. 609; Anderson v. Anderson, 188 Minn. 602, 248 N. W. 35; Kokesh v. Price, 136 Minn. 304, 161 N. W. 715, 23 A. L. R. 643. The proper practice is to require the jury by general verdict to assess the entire damages for loss of the life to all the beneficiaries; to determine by special verdict whether any beneficiary of the recovery was guilty of contributory negligence; and then to deduct from the general verdict the amount of the special verdict if the latter is against the beneficiary. Peterson v. Anderson, 183 Minn. 86, 235 N. W. 534. The manner of determining whether a beneficiary of the recovery in a wrongful-death case was guilty of contributory negligence is largely one of judicial administration. Where, as here, two actions arising out of the same accident are tried together, it is not important in which of the two the question is determined. The court had the power to determine it either by special verdict in the wrongful-death action or by general verdict in the beneficiary's individual action. All that was required was that the question be determined as the basis for an apportionment if one should be made. Here, the court determined the question in the individual action. As a procedural matter, this was no different from taking a special verdict. The finding implicit in the verdict in the individual action is that plaintiff was not guilty of contributory negligence. If the verdict had been the other way, the court would have deducted from the recovery in the death case William's share thereof. The procedure adopted for determining the question could not and did not prejudice defendant.

8. An actionable wrong causing injury to the wife gives rise to two causes of action against the wrongdoer, viz., one in favor of the wife for the damages suffered by her personally, and another in favor of her husband for loss of her services and society and for

expenses to which he is put in taking care of her. The wrong to the husband insofar as it involves such expenses is deemed to be one to his property or estate and not to his person, for the reason that his property or estate is diminished by the payment thereof. Fowlie v. First Minneapolis Trust Co. 184 Minn. 82, 237 N. W. 846, 78 A. L. R. 589, and Annotation. In accord, Eklund v. Evans, 211 Minn. 164, 300 N. W. 617.

Whether a husband's cause of action includes as a part thereof the expense of burying his wife where her death is caused by the wrongful act is an open question. In the Fowlie case we said (184 Minn. 83, 237 N. W. 846) that in such cases "the recovery for loss of services and the expenses incurred in the attempt to save her life is limited to the time intervening between the injury and the death." But that of course leaves undecided the further question as to whether the husband may recover in such cases for the expenses of his wife's burial.

A husband is personally liable for the expense of his wife's burial. Gleason v. Warner, 78 Minn. 405, 81 N. W. 206. In certain cases the husband is entitled to be reimbursed for such expenses, as where his wife leaves an estate by having it paid either as a claim against her estate or an expense of administration (Kelly v. Snow, 168 Minn. 298, 210 N. W. 105; 3 Dunnell, Dig. & Supp. §§ 3575, 3593e), or where there is a recovery for her wrongful death by asserting a claim therefor against the fund recovered (Prescott v. Swanson, 197 Minn. 325, 267 N. W. 251). The husband's personal liability for the expenses of his wife's burial results as directly and proximately from the wrongful act causing her injuries and death as do the expenses for treatment, care, and nursing, and is in no way lessened or otherwise affected by his right to reimbursement.

The authorities are in hopeless conflict as to whether the wrongdoer is liable to the husband in such cases for the expenses of the wife's burial. The husband's right to recover therefor was sustained in such cases as Southern Ry. Co. v. Covenia, 100 Ga. 46, 29 S. E. 219, 40 L. R. A. 253, 62 A. S. R. 312; Carnego v. Crescent Coal Co. 164 Iowa 552, 146 N. W. 38, Ann. Cas. 1916D, 794; Eden v.

Lexington & Frankfort R. R. Co. 53 Ky. (14 B. Mon.) 204 (Reprint p. 165); McCubbin v. Hastings, 27 La. Ann. 713; Worley v. Cincinnati, H. & D. R. Co. I Handy (Cin. S. C.) 481; Hansen v. Hayes, 175 Or. 358, 154 P. (2d) 202; Armstrong v. Marshall (Tex. Civ. App.) 146 S. W. (2d) 250; Philby v. N. P. Ry. Co. 46 Wash. 183, 89 P. 468, 123 A. S. R. 926, 9 L.R.A. (N.S.) 1193, 13 Ann. Cas. 742. Dicta to that effect are found in some cases. Pack v. The Mayor, etc., of City of N. Y. 3 N. Y. (3 Comst.) 489. An equally imposing array of authorities denies such a right of recovery. Nixon v. Ludlam, 50 Ill. App. 273; Shields v. State, 149 Ind. 395, 49 N. E. 351; Ferguson v. Delaware & Atlantic T. & T. Co. 71 N. J. L. 59, 58 A. 74; Callaghan v. Lake Hopatcong Ice Co. 69 N. J. L. 100, 54 A. 223; Tollerson v. Atlantic Coast Line R. Co. 188 S. C. 67, 198 S. E. 164; Restatement, Torts, § 925. The English cases also deny such a right of recovery. Admiralty Commrs. v. S. S. Amerika [1917] A. C. 38, Ann. Cas. 1917B, 877; Clark v. London General Omnibus Co. Ltd. [1906] 2 K. B. 648, 2 British R. C. 694, and note, 6 Ann. Cas. 198.

Some American courts have followed the English cases as announcing the settled law. Others have refused to follow them as being without sound reason or as resting upon reasons now entirely nonexistent or not adapted to our conditions. Some cases like Eden v. Lexington & Frankfort R. R. Co. *supra,* follow generally the English rule that a death can give rise to no action for damages, but allow the husband to recover for expenses of his wife's burial. Numerous American cases criticize with more or less severity the English cases. The English cases have been reviewed at length, analyzed, and subjected to devastating criticism by Judge Dillon in Sullivan v. Union Pacific R. Co. (8 Cir.) 3 Dill. 334, 23 F. Cas. No. 13,599, p. 368. Similar criticism of them was made by Judge Deady in Holmes v. O. & C. Ry. Co. (D. C.) 5 F. 75. The English rule was also disapproved in other cases. Hansen v. Hayes, 175 Or. 358, 154 P. (2d) 202; Philby v. N. P. Ry. Co. 46 Wash. 173, 89 P. 468, 123 A. S. R. 926, 9 L. R. A. (N. S.) 1193, 13 Ann. Cas. 742, *supra.* These cases and others cited show that the English courts have given as reasons for their rule such wholly untenable ones as

that a wrongful death causing harm cannot be the basis of an action; that a personal right of action dies with the person; that it is against public policy to set a money value on a human life; that the private wrong is merged in the felony as a public one; and, finally, that the English rule is purely historical.

The utter lack of any good reason to sustain the decisions of the English courts and the inapplicability of the English rule to American conditions have been pointed out in numerous well-considered cases. Judges Dillon and Deady covered most of the ground in their decisions above cited. In Travelers' Ins. Co. v. Great Lakes Eng. Works Co. (6 Cir.) 184 F. 426, 36 L.R.A. (N.S.) 60, and note, it is shown that death caused by violation of duty to another may be the basis for a cause of action against the wrong-doer for damages directly and proximately resulting therefrom. Other cases cited by us show clearly that the English courts mis-applied in cases of this kind the maxim that a personal right of action dies with the person. The cause of action which dies with the person is one which belongs to the person who dies and not to someone else. Hence, under the maxim, only a cause of action based upon personal right belonging to the wife would die with her (par-enthetically, by statute, the maxim has been rendered largely nuga-tory in cases of this kind, if not entirely so. Kuhnle v. Swedlund, 220 Minn. 573, 20 N. W. [2d] 396), but not one belonging to the husband. Furthermore, the husband's cause of action is not only separate and distinct from that of his wife, but also it is not a cause of action based upon personal right as that term is used in the maxim, but on the contrary is one based on injury to his property or estate, which survives the death of both the husband and the wife. Fowlie v. First Minneapolis Trust Co. 184 Minn. 82, 237 N. W. 846, 78 A. L. R. 589, *supra*. Whatever public policy may have been, modern statutes allowing recovery for the money value of human life in actions for wrongful death and in workmen's com-pensation-cases in effect declare as a matter of public policy that there is no valid objection to appraising the money value of a human life. Public policy is what the legislature declares it to be.

Park Const. Co. v. Independent School Dist. 209 Minn. 182, 296 N. W. 475, 135 A. L. R. 59. The doctrine that private wrongs are merged in felonies as public ones has long since been repudiated as not adapted to our conditions. Worley v. Cincinnati, H. & D. R. Co. I Handy (Cin. S. C.) 481, *supra*. Furthermore, neither at common law nor under modern statutes does every wrongful death amount to a felony. The resort to history (see, Lord Sumner's judgment in Admiralty Commrs. v. S. S. Amerika [1917] A. C. 38, Ann. Cas. 1917B, 877) is not convincing, because it was given as a reason only after all others had failed. In summing up his review of the English and American cases, including Baker v. Bolton, 1 Camp. 493, 170 Reprint 1033, from which the modern English cases stem, Judge Dillon said in the Sullivan case (3 Dill. 341, 23 F. Cas. No. 13,599, p. 371):

"In view of the tenor of the cases, some of which, however, are not well considered, and all of which rest upon Baker v. Bolton, it requires some courage to disregard them; but as the rule they assert is incapable of vindication, and cannot be shown to be deeply rooted in the common law, my judgment is, that I am free to decide the rights of the parties without applying it."

In making a choice here between the rule allowing the husband to recover in cases like this the expenses of his wife's burial and the one denying such right, we should be guided by the rule that the common law is not in force in this state where the reasons for it have ceased to exist or it is not adapted to conditions existing here. 1 Dunnell, Dig. & Supp. § 1503. In Rye v. Phillips, 203 Minn. 567, 569, 282 N. W. 459, 119 A. L. R. 1120, we overruled and rejected as a "museum piece of the law" the common-law rule that a new consideration is necessary to sustain a debtor's promise to accept something less than is due upon a liquidated debt in satisfaction thereof, which we already had adopted and followed, for the sole reason that the old rule was not sustained by sound reason. We there said (203 Minn. 570, 282 N. W. 460): "There is more than one ground of logic and good law upon which this old and indefensible rule may be discarded." Reasons adequate for reject-

ing a rule after we have once adopted it should be adequate for not adopting it in the first instance. That is the situation here. There is no valid reason for the rule denying the right of recovery. Sound reason supports the rule allowing it. We adopt as sound in reason and adapted to our conditions the rule that permits a husband to recover in a case of this kind the expenses of his wife's burial.

The wrongful-death statute now covers the entire field as to the damages recoverable by the husband as a beneficiary the same as other beneficiaries, except burial expenses. See, Watson v. St. Paul City Ry. Co. 70 Minn. 514, 73 N. W. 400; 2 Dunnell, Dig. & Supp. §§ 2608, 2617. Where, as here, the burial expenses are not included in the amount recovered in the wrongful-death action, there is no objection, if the wrongdoer is otherwise liable, to compelling him to pay the same in the husband's action.

9. OPA ceiling prices were not intended to limit the amount recoverable against a wrongdoer for destruction of or injury to property. Ross Produce Co. v. Thompson, 236 Iowa 863, 20 N. W. (2d) 57.

10. Defendant has failed to point out wherein the verdict is excessive and what basis there is for his contention that it was granted under the influence of passion and prejudice. Such failure compels affirmance as against the contention that excessive damages were awarded under the influence of passion and prejudice. The verdict here upon its face does not appear to be excessive. Chase v. Fitzgerald, 132 Conn. 461, 45 A. (2d) 789, 163 A. L. R. 247. A party asserting on appeal that a verdict is excessive has, as a part of his burden of affirmatively showing error, the burden of explicitly showing wherein the verdict is excessive, and if he fails in this respect the verdict will not be disturbed. Jacobson v. C. & N. W. Ry. Co. 221 Minn. 454, 22 N. W. (2d) 455; 1 Dunnell, Dig. & Supp. §§ 368, 373.

Our conclusion is that there should be an affirmance.

Affirmed.