RUPERT S. WAGENHALS AND ANOTHER v.
JACK FLINT.

114 N. W. (2d) 641.

April 13, 1962—Nos. 38,356, 38,357.

*James J. Courtney & Sons* and *Harry H. Peterson,* for appellants.
*Nye, Sullivan, McMillan, Hanft & Hastings* and *Edward T. Fride,* for respondent.

OTIS, JUSTICE.

These actions were brought by the plaintiffs to recover damages for injuries they sustained when their car collided with a truck which was owned and operated by the defendant. The verdicts were in favor of defendant and he was awarded damages on his counterclaim. From judgments thereafter entered the plaintiffs appeal.

On May 31, 1958, at about 6:30 in the evening, plaintiff Rupert Wagenhals (hereinafter referred to as plaintiff) drove an automobile, in which his wife, Betty, was a passenger, in a southerly direction on Mesaba Avenue in the city of Duluth, and turned left, or east, onto First Street. The defendant Flint at the time of the collision was operating his truck in a northerly direction on Mesaba Avenue. At the location in question Mesaba is divided by a boulevard which is 25 feet wide north of First Street and 38 feet wide south of First Street. Traffic on Mesaba and on First is governed by four automatic traffic signals located at the following points:

Signal No. 1, facing north only, is at the extreme southwest corner

of the intersection of the various highways; signal No. 2 which faces north, east, and west is at the northwest corner of the boulevard south of First Street; signal No. 3 which faces south only is located at the extreme northeast corner of the intersection of the various highways; signal No. 4, with which we are here concerned, is located at the southeast corner of the boulevard north of First Street, and faces south, east, and west.

There are four issues raised by this appeal:

(1) Whether the south half of First Street where it intersects the east half of Mesaba Avenue forms a separate intersection by virtue of the division of Mesaba by a boulevard exceeding 30 feet in width south of First Street.

(2) Whether traffic entering the east half of Mesaba from the west on First Street is governed by traffic-control signals.

(3) Whether the jury could find that defendant was traveling at a speed in excess of 30 miles an hour when he entered the intersection.

(4) Whether the evidence requires a finding that defendant failed to keep a proper lookout and was therefore negligent as a matter of law.

In order better to understand the manner in which the two highways intersect, a photograph of the intersection is herewith reproduced.[1] The camera faces south on the west half of Mesaba. Plaintiff was traveling south when he made a left turn, turning east on First Street. At the time of the collision the defendant was coming up the east half of Mesaba heading north. Visible in the picture are three of the traffic signals described, No. 1 being at the right, No. 2 being in the middle, and No. 4 being at the left. Traffic signal No. 3 is out of the photograph to the left.

Plaintiff testified that in the course of making the left turn he stopped momentarily before crossing the east half of Mesaba and had nearly cleared the intersection when he was struck on the rear-right side of his car by defendant. The theory on which plaintiffs rely for recovery is that the 38-foot boulevard south of First Street makes

---

[1]The labels indicating the directions and locations have been added by this court to plaintiffs' exhibit F.

the south half of First Street, where it intersects the east half of Mesaba, a separate intersection under Minn. St. 169.01, subd. 36(b), which reads as follows:

"Where a highway includes two roadways 30 feet or more apart, then every crossing of each roadway of such divided highway by an intersecting highway shall be regarded as a separate intersection. In the event such intersecting highway also includes two roadways 30 feet or more apart, then every crossing of two roadways of such highways shall be regarded as a separate intersection."

Plaintiffs contend that the traffic signals are not located so as to control cars making a left turn from the north entering the east half of Mesaba, and argue that the trial court was therefore obliged to charge the jury under § 169.20, subd. 1, which reads thus:

"When two vehicles enter an uncontrolled intersection from different highways at approximately the same time the driver of the vehicle on the left shall yield the right of way to the vehicle on the right.

"The driver of any vehicle traveling at an unlawful speed shall forfeit any right of way which he might otherwise have hereunder.

"The foregoing rules are modified at through highways, and otherwise as hereinafter stated in this section."

Under plaintiffs' theory of the case, the area where the cars collided was a separate uncontrolled intersection in which the plaintiffs had the right-of-way by virtue of their claim that defendant forfeited the right-of-way in exceeding 30 miles per hour.

The trial court ruled that the area where the south half of First Street intersects the east half of Mesaba was *not* a separate intersection under § 169.01, subd. 36(b), and charged the jury that the rights of the parties to proceed into the intersection were governed by the automatic traffic signals under § 169.06, subd. 5. The court refused to submit the question of whether defendant forfeited his right-of-way, and held that there was not sufficient evidence to warrant a finding that defendant was driving in excess of 30 miles an hour.

■ While the precise question which plaintiffs raise is a novel one in Minnesota, we believe there is precedent for holding that half of

a highway may form a separate intersection for purposes of determining the right-of-way. Under statutes long since superseded, our court held in Holman v. Ivins, 150 Minn. 285, 184 N. W. 1026, 21 A. L. R. 964, that the north half of Summit Avenue in St. Paul, where it is intersected by Mackubin Street from the north only, was a separate intersection which required a driver coming from the west and turning left on Mackubin to yield the right-of-way to vehicles coming from the east on Summit. We there held that half of the street could be treated as a separate intersection for purposes of applying a right-of-way statute similar to § 169.20, subd. 1. While at first blush it may appear incongruous to decide that half of a street is a separate intersection for traffic headed in one direction while the other half is part of a larger intersection for traffic headed in the other direction, we believe as a practical matter the purpose of § 169.01, subd. 36(b), is well served by such a holding. There are several considerations which seem to have prompted the adoption of that statute. Where a highway is divided by a boulevard which is less than 30 feet in width, intersecting traffic has ample opportunity to observe and comprehend the entire picture of traffic movement within a relatively confined area. Where, however, there is a boulevard in excess of 30 feet, it is more difficult for drivers approaching from different directions to grasp quickly the intentions and maneuvers of other drivers. If the rights of motorists are to be governed by what occurs as they enter an intersection, it is essential that they be able to take in the whole situation at a glance. This, of course, cannot be done where cars enter an intersection at some considerable distance apart. Apparently the legislature had this problem in mind when it reduced the size of what is considered an intersection to permit the rights and obligations of drivers to be established when they are in closer proximity to one another. In our situation cars coming from the west and north using the south lane of First Street, or from the south on Mesaba, are affected by the width of the 38-foot boulevard south of First Street. Cars using the north half of First Street going west pass a narrower boulevard separating conflicting traffic. Hence there is some logic in treating differently the north half and south half of First Street.

Another reason for giving effect to the statute occurs to us. Where

a boulevard is in excess of 30 feet in width, there is space for vehicles to stand between the two divided lanes of traffic without so much likelihood of interfering with conflicting traffic. It may also be of some significance that at this particular intersection the signal lights are so synchronized that in one of their phases traffic in all directions is required to stop except cars headed east on First Street. For the reasons stated we see nothing inconsistent with requiring cars headed east into the east half of Mesaba to proceed as if approaching a separate intersection, while cars headed west are not so governed. While the trial court decided as a matter of law that the entire area here involved consisted of one intersection, the issue of which driver proceeded through a red light was squarely presented to the jury and resolved in defendant's favor. In view of our holding that both drivers were governed by § 169.06, subd. 5, the court's failure to treat the south one-half of the area where First Street intersects the east half of Mesaba Avenue as a separate intersection was harmless error.

■ Notwithstanding the existence of the four traffic-control signals which have been described, plaintiffs take the position that when their car entered the east half of Mesaba it was approaching an uncontrolled intersection because of the peculiar location of the signals. We do not agree. When the plaintiff entered First Street southbound on Mesaba, traffic-control signal No. 1 which he faced was green or "go," and since the signals were synchronized, it is obvious that the signal was also green or "go" for the defendant as he came up Mesaba in a northerly direction. Defendant so testified. However, plaintiff earnestly contends that signal No. 4 on the southeast corner of the north boulevard was not visible to him as he made his left turn to enter the east half of Mesaba. But his argument loses much of its force by virtue of his testimony that as he made the left turn he failed to look at signal No. 4. It is obvious from all the evidence, including plaintiffs', that as he came into First Street with a green light, signal No. 4 was red for traffic headed east on First Street. This being so, plaintiff driver was obliged to stop and wait for the signal to change and to yield the right-of-way to defendant under § 169.06, subd. 5. Furthermore, it is preposterous to contend that a person in defendant's position, seeing a green light, was obliged to treat the intersection as uncontrolled. Noth-

ing could result in a more chaotic state of affairs than to trap a motorist into assuming he was permitted to proceed through a green light only to find that traffic from right or left was permitted to cross in front of him with impunity. In this conclusion we are supported by Judge Sanborn's observation in Olson v. Hiel (8 Cir.) 177 F. (2d) 552, 554:

"* * * The contention that the route followed by Aberg across the intersection should be regarded as an uncontrolled route in a controlled intersection is, we think, unsound. A driver who, like Olson, is facing a green light in his lane of such an intersection ought not to be required to anticipate that the intersection may contain one or more uncontrolled routes and that he may suddenly be confronted with cross traffic, notwithstanding the signal directing him to proceed."

In any event, we hold that the evidence conclusively demonstrates that signal No. 4 governing plaintiff's progress into the east half of Mesaba was plainly visible to him, without extending himself, as he made his turn.

■ It is plaintiffs' position that there is eyewitness testimony, as well as evidence from the physical facts, which permitted the jury to find defendant was traveling in excess of 30 miles an hour. Plaintiffs made no estimate of defendant's speed, and defendant himself testified he was traveling at less than 30 miles an hour. One of plaintiffs' witnesses, however, estimated defendant's speed as follows:

"Well, the truck was coming fast up the hill. * * *

* * * * *

"Well, I judge 30 or possibly more. I wouldn't say more, but 30 or possibly more."

We believe that this testimony standing alone was not of sufficient probative value to require the court to submit to the jury the issue of defendant's excessive speed. Walker v. Ruvelson, 257 Minn. 391, 395, 102 N. W. (2d) 19, 22; see, Ballweber v. Kleist, 248 Minn. 102, 112, 78 N. W. (2d) 671, 677.

Plaintiffs argue that even in the absence of direct testimony the physical facts of the accident required the court to submit the issue of

excessive speed. In support of this contention plaintiffs rely on their own testimony of distances traveled by the two vehicles in a given period of time, as well as on the violence of the impact, in that it turned plaintiffs' car around and threw Mrs. Wagenhals into the street. While we recognize that there are situations in which a variety of physical factors may be used as a basis for a jury's determination of speed and the other circumstances of an accident, we do not believe this is such a case. Norton v. Nelson, 236 Minn. 237, 241, 53 N. W. (2d) 31, 34; Dosdall v. Swift & Co. 238 Minn. 283, 285, 56 N. W. (2d) 433, 435; Carpenter v. Brikholm, 242 Minn. 379, 386, 65 N. W. (2d) 250, 254.

In the instant case the court instructed the jury that 30 miles an hour was the limit and anything in excess of that speed was unlawful. The court charged that there was no evidence that defendant exceeded 30 miles an hour but that it was for the jury to determine whether there were any special hazards which would make his speed excessive under the circumstances. The substance of the statute which requires a reduced speed where actual or potential hazards exist was read. In view of the court's charge regarding the necessity for driving at a reduced speed at intersections, curves, and hills, there is inherent in the jury's verdict a finding that defendant was not negligent in this respect.

■ Defendant testified that although he looked to the left as he approached the intersection he didn't see plaintiff before the accident occurred. Plaintiffs invoke the "look-and-not-see-that-which-is-in-plain-sight" rule in support of their contention the defendant was negligent as a matter of law in failing to keep a proper lookout. The court did instruct the jury that reasonable care on the part of drivers included—

"* * * the duty to be alert in the use of their senses to discover danger which may be present and to maintain a careful lookout for what the conditions are that may affect the safety of driving at a particular time and place."

The court went on to say:

"* * * Every driver must use a degree of care which is commensurate with the dangers which he sees to be present or which he should, in the exercise of proper care, anticipate or foresee."

The present rule governing lookout has evolved from our decision in Underdown v. Thoen, 193 Minn. 260, 258 N. W. 502, where we held a driver guilty of negligence as a matter of law in failing to see the other vehicle when it was within plain view. We pointed out, however, that there was no reliance on the right-of-way rule, in contrast to the situation which we find in the instant case. To the same effect is Gotzian v. Wolk, 201 Minn. 38, 275 N. W. 372. The doctrine was more recently clarified in the leading case of Moore v. Kujath, 225 Minn. 107, 29 N. W. (2d) 883, 175 A. L. R. 1007. See, also, Haugen v. Dick Thayer Motor Co. 253 Minn. 199, 208, 91 N. W. (2d) 585, 591. There we stressed the fact there were no mitigating or distracting surrounding circumstances to justify the driver's failure to see what was in plain view. Among other considerations we have mentioned are weather conditions, highway obstructions, and the contour of surrounding land. In applying the lookout rule we have also held that due care as a matter of law is not to be determined by the *number* of observations made by a driver. Mattfeld v. Nester, 226 Minn. 106, 119, 32 N. W. (2d) 291, 301, 3 A. L. R. (2d) 909; Martin v. Reibel, 227 Minn. 106, 110, 34 N. W. (2d) 290, 292; Kolatz v. Kelly, 244 Minn. 163, 171, 69 N. W. (2d) 649, 655.

As applied to the facts of this case we cannot say defendant was negligent as a matter of law in failing to see the plaintiff before the collision. Here the accident occurred in the early evening on a rainy day at a time when it was drizzling and required windshield wipers, and defendant was proceeding upgrade at a slight curve, relying on his right to proceed through a green light. Under such circumstances the jury was warranted in finding that he was not guilty of a negligent failure to maintain a proper lookout.

Affirmed.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.