BERNARDINO RAMPI v. JOHN P. VEVEA AND OTHERS.
NORTHERN STATES POWER COMPANY, APPELLANT.[1]

June 10, 1949.

No. 34,837.

---

[1]Reported in 38 N. W. (2d) 297.

*Charles H. Weyl,* for appellant.

*Fred A. Ossanna* and *S. A. Weisman,* for Bernardino Rampi, respondent.

MAGNEY, JUSTICE.

A verdict was returned against defendants Northern States Power Company and John P. Vevea and in favor of defendant Theodore Rampi. Defendant company appeals from an order denying its alternative motion for judgment or a new trial. Defendant Vevea made no motion.

Defendant company is a public utility which distributes electric current. Defendant Vevea is one of its meter readers. On October 11, 1946, Vevea, driving his own automobile, collided with an automobile owned and operated by defendant Rampi. Ida Rampi, a passenger in the Rampi car, sustained injuries from which she died. The special administrator of her estate brought action.

Eighth avenue southeast in Minneapolis runs north and south. It intersects Fifth street southeast. Vevea was driving his car west along Fifth street as close to its north curb line as cars parked there permitted. Rampi was driving his car north on Eighth avenue. The cars collided in the intersection.

The company employed 30 or 40 meter readers. Every morning they assembled at its office and were assigned areas within which they were to work during the day. Each meter reader was given a meter route book, flashlight, sealer, and pencil. When he had completed the work assigned to him for the day, irrespective of what

time he got through, he was required to return to the office with his meter route book, which recorded his work for the day, sign the register, and go home. The hours of work were from 8 a.m. to 5 p.m. The men working in town, one mile or more from the office, were credited with 30 cents a day, the equivalent of the going cost of four streetcar tokens, which if used would take them to and from the place of work and to and from a place for noon lunch. No tokens were given them. Occasionally a man would be credited with the cost of an extra token if given two small routes between which there was a gap. If he was working out of town, he was furnished with transportation facilities. He might be paid his bus fare or transportation cost. Prior to October 11, 1946, eight meter readers were using their own cars while traveling between the central office and the areas where they were assigned to work. John D. Hassler, the supervisor of the meter-reading department, testified that he did not know if Vevea or others were constantly using their personal automobiles in connection with their work. He said that the first time he heard of Vevea doing so was the day of the accident. He testified that on one occasion he knew that a meter reader used his own car, and added: "There might have been several incidents over a period of years but I cannot recall any particular incident." He said that new men were instructed to use the streetcar. After Vevea's accident, a rule was posted on the bulletin board to the effect that unless the car driven by an employe was leased by the company or unless he had permission from the proper authorities the employe would be subject to immediate dismissal. No such rule was on the bulletin board in 1944 or 1945. There was testimony that in Hassler's office, and in his presence, men were asking others who had their own cars: "Are you going my way?" and that Hassler chided one of the men about driving his car out to breakfast after assignments had been made. One witness testified that he got rides from meter readers who were driving their own cars, and once or twice from Vevea. Vevea had been employed as a meter reader for 25 years. He said that prior to the accident there was no bulletin on the board requiring meter readers to refrain from

using their own cars, and as far as he could recall he was never instructed not to use his own car. He started using his own car ten years ago. He stated that he did not know whether Hassler had ever seen him use his automobile in his work, but that Hassler knew he used it. He had talked with other meter readers in Hassler's office and in his presence about taking them to their destination on a workday, and that he was not aware of the stringent rule until after the accident, nor had he ever received any instructions from union officials not to use his own car. George P. Phillips, president of the Minneapolis Central Labor Union, then business manager of the local union, on February 7, 1941, wrote the personnel director of the company:

"Until it is understood between the Company and the Local Union that these men will not be held responsible for accidents while on Company business, the Union has instructed these men not to use their own personal cars in getting from the reporting place to the district in which they work, to return back to the reporting place upon completion of the day's work, or in the performance of their duties."

On February 12 he received the following reply:

"Pursuant to our conversation today regarding meter readers, would you please inform the meter readers at once that they are to return to the normal and usual methods of operation that they formerly worked prior to Monday, February 3, 1941, * * *.

* * * * *

"In the meantime, we assure you that no action will be taken against any meter reader because of a disagreement between us as to whether or not a rule exists that meter readers are not permitted to use their own automobiles while on Company duty * * *."

Vevea was present at a meeting of meter readers on February 15, 1945, when they were told by Phillips and the personnel director that they should not use their own cars on company time. He claims that he does not remember the use of their own personal cars being mentioned.

■ The company's first six assignments of error are grouped into one argument, wherein it contends that it is not liable for Vevea's negligence as a matter of law. We have related in considerable detail the facts covering the relationship between the company and its meter readers, including Vevea. Vevea had for years used his own personal car and credited himself with 30 cents a day for tokens. About seven other meter readers did the same thing. There can be no question that in 1941 the company knew that meter readers were using their own cars while performing their duties. These facts, together with others already set out, made it a question for the jury whether the company knew or should have known that the men used their own cars in connection with their work.

At the time of the accident, Vevea was driving his own automobile while returning to the central office from the district where he worked. It was his duty, as well as the duty of all meter readers, to return to the office with his meter route book after his day's assignment of work was completed. He also had in his possession additional equipment belonging to his employer. There can be no question that at the time of the accident he was engaged in the furtherance of his master's business. The controversy is centered on the fact that Vevea was using his own car without express consent and, as the company claims, without implied consent when transportation was furnished by his employer.

In Elliason v. Western Coal & Coke Co. 162 Minn. 213, 215, 202 N. W. 485, 486, we said:

"The doctrine of respondeat superior rests in part at least upon the power of the master to select, control and dismiss his servants. In determining whether the defendant is liable, proper inquiries are: What was the tort feasor employed to do? Was he doing something within the range of the contract of hiring? Who owned the instrumentality by means of which the tort was committed? If it did not belong to the defendant, was the tort feasor's use of it expressly or impliedly authorized? Was he on or off duty at the time and place of the injury to plaintiff? These are matters of probative

significance. Their significance may be so clear as to warrant the court in holding that as a matter of law the rule of respondeat superior is or is not applicable, but, if more than one inference may fairly be drawn from the facts, or if there is a conflict of testimony regarding the facts, then the question should be submitted to the jury. If the relation of master and servant exists between the defendant and the tort feasor, the test of responsibility is usually stated thus. Was the servant acting in the course and within the scope of his employment when the tort was committed, or was he at liberty from the service and pursuing his own ends exclusively?"

Applying the queries in the above excerpt to the facts of this case, we have this situation: Vevea was employed to read meters. At the time of the accident, he was returning his meter route book to the central office as he was ordered to do. All meter readers were required to do so. He was thus within the range of his contract of hire. He was on duty at the time and place of the injury to decedent. He was on an errand of his employer. He personally owned the instrumentality by means of which the tort was committed. Since the instrumentality did not belong to defendant, was Vevea's use of it expressly or impliedly authorized? The evidence conclusively shows that it was not expressly authorized. The remaining question is whether its use was impliedly authorized. If the company knew that Vevea used his own car in the manner he did, there is basis for the finding that its use was impliedly authorized. If the use of their own cars by meter readers, including Vevea, was such that the company should have known that meter readers were doing so, that would also be a basis for a finding that their use was impliedly authorized.

The company relies on Erickson v. G. N. Ry. Co. 191 Minn. 285, 253 N. W. 770. The facts in that case are briefly as follows: Defendant Johnson was employed by the defendant company as carman at its Mississippi street coach yards in St. Paul. Every morning, including Sundays, Johnson and about 15 other men went to the union depot to make repairs on the company's trains. These

men were taken to the depot and returned to the yards by means of a bus provided by the company. Johnson used this bus on weekdays, but on most Sundays, because of poor streetcar service and exclusively for his own convenience, he drove his own car from his home to the depot and from the depot to the coach yards. On a Sunday, as he was driving his car from the depot to the coach yards, the accident took place. This court held that (191 Minn. 289, 253 N. W. 771) "Nothing connected with the trip or with the operation of the car had anything whatsoever to do with the work in which he was employed," and (191 Minn. 290, 253 N. W. 772) "in making this trip he was not on an errand of his employer but made the same for his own purpose and convenience only." It is apparent that the Erickson case has no application under our facts here. Vevea drove his car in connection with the work in which he was employed, and at the time of the accident was on an errand for his employer.

Plaintiff bases his contention chiefly on Kuehmichel v. Western Union Tel. Co. 125 Minn. 74, 145 N. W. 788, L. R. A. 1918D, 355. There, one Geminder was employed by defendant as a messenger. His hours of employment included 7 to 8 in the evening. He used his own bicycle with the assent of the company in performing his duties. In the afternoon of the day of the accident, the local manager told Geminder that there might not be anything for him to do after supper, but to stay by the phone, and, if needed, he would be called. At 7:15, Swanson, the night operator, also Geminder's superior, called him and said (125 Minn. 75, 145 N. W. 789) : "Come down right away, we have a message for you to deliver." He started for the office on his bicycle and negligently collided with plaintiff. When he arrived at the office Swanson said to him: "There isn't any message to deliver. I just wanted you to take my place this evening." A verdict for the plaintiff was sustained. This court, after reviewing numerous cases, said (125 Minn. 77, 145 N. W. 789) :

"* * * The test in determining whether the doctrine of *respondeat superior* applies is, generally, whether the person sought to be

charged had at the time the right to control the action of the person doing the wrong, both as to the acts done and the manner of doing them. [Citing cases.]

"In this case Geminder was acting under orders from his superior and during the period covered by his wages of employment. He was using his bicycle with the knowledge and assent of defendant company. He was not on any business of his own. He was not his own master. He was serving his employer, and without doubt his employer had the right to control and direct his actions at the moment of his negligent act, both as to any act done and as to the manner of doing it as well. We are of the opinion that he was at the time in the service of the defendant company and that that defendant is liable for his negligence."

The difference between the above case and the instant one is, of course, that there was no question that Geminder was using his bicycle with the knowledge and assent of his employer. Here, the evidence is in dispute whether Vevea used his own car with the knowledge and implied authorization of the company, and, as stated in our opinion, that was a question for jury determination.

In Elliason v. Western Coal & Coke Co. 162 Minn. 213, 218, 202 N. W. 485, 488, this court said:

"The tendency of the courts is to enlarge the field of operation of the doctrine of respondeat superior. The doctrine is bottomed on the principle that he who expects to derive advantage from an act done for him by another should answer for any injury which a third person may sustain from the act. The rapid industrial and commercial progress of the times has brought about conditions which render it expedient in the interests of the community to extend the application of the rule that every man, in the management of his affairs, whether by himself or by his agents or servants, shall take care not to injure another, for only by imposing vicarious liability upon employers can vigilance be secured in the selection and supervision of employes to the end that those who are incom-

petent or reckless may be weeded out. See 6 Labatt, M. & S. pp. 6731, 6780-6787."

Although this case is a close one on the question already discussed, we are of the opinion that the evidence supports the proposition that the company knew or should have known that meter readers were using their own cars in connection with their work.

■ The company also contends that the evidence fails to justify a verdict in favor of Rampi; that in fact a verdict should have been rendered against him as a matter of law.

As stated, Vevea was driving west on Fifth street. Rampi was going north on Eighth avenue, slightly to the left of the center of the avenue. Fifth street, east of Eighth avenue, is 32 feet wide between curbs, and west of the avenue it is 42 feet wide. Eighth avenue is 40 feet wide between curbs. Vevea was operating his car to the right of the center of the street, far enough out from the curb so as not to come in contact with parked cars, and about half a foot north of the center as he approached the crosswalk, according to his own testimony. A year or so prior to the accident he had difficulty with his brakes. He testified that he saw Rampi approaching from the south, slowed down, and when he put on his brakes something snapped and they failed to operate. The front of his car struck the right rear wheel of the Rampi car. Rampi testified that when he arrived at about the sidewalk, almost into the intersection, he almost came to a stop. He looked to the left and saw no car coming. He then looked to the right and saw a car even with the alley or on the other side about 130 or 140 feet away. He said:

"* * * I figured I had plenty of time to get across so I shifted into second and proceeded slowly across the intersection and *I was about half way across and I looked to my right and I could see this fellow coming down very fast* * * *." (Italics supplied.)

That is the first time he noticed that Vevea was "coming down very fast." He continued:

"I was a little past half way. I could see he was still coming and I kept putting my foot on the gas because I thought he would

stop, so I kept going and tried to get out of there as quick as I could and before I cleared all the way through he hit me."

At the time of the impact, the front bumper of the Rampi car was over the north curb line of Fifth street. After the cars came together Vevea's car skidded about 25 feet. Shortly after the collision, Rampi said to Vevea, "Boy, you must have been going about 50 miles an hour." Vevea answered, "Man, I was only going 27." He said he tried to stop but that the brakes would not. work. The evidence clearly supports the claim of negligence made against Vevea. As stated, Rampi did not notice that Vevea was coming fast until he was halfway across the intersection. As stated, the impact occurred when the front bumper of the Rampi car was over the north curb line of Fifth street. Under these facts, it cannot be said as a matter of law that Rampi was guilty of negligence. Mattfeld v. Nester, 226 Minn. 106, 32 N. W. (2d) 291, 3 A. L. R. (2d) 909; Bosell v. Rannestad, 226 Minn. 413, 33 N. W. (2d) 40.

■ In its motion for new trial, the company contends that errors were committed at the trial which require the granting of a new trial. The court charged the jury as follows:

"As I said before one of the issues in this case is regarding the defendant Vevea as to whether he was in the course of his employment, and that brings up a rule that is known to the lawyers as respondeat superior. Literally interpreted, this means 'Let the master answer.' More fully it means that a master or employer is liable in certain cases for the wrongful acts of his servant or employee. The test in determining whether the principle of respondeat superior applies generally is whether the person sought to be charged had, at the time, the right to control the actions of the persons doing the wrong, both as to the acts done and the manner of doing them."

The company insists that the above language was misleading and harmful, in that the only interpretation of this charge by the jury was that, since Vevea was an employe and that he was going back to the office, the company was therefore liable. Taking the charge

as a whole, we are of the opinion that the contention is not well founded.

The company also contends that the court erred in giving the following charge:

"The evidence is undisputed that John Hassler was the Supervisor of Meter Readers and had authority with respect to the meter readers of the company and *if you should find that John Hassler knew or should have known that the meter readers—and when I say John Hassler I mean also any other of the Power Company's officials—knew or should have known* that such meter readers of the company were using their personal cars in the performance of their assignments by the company and on company business and *you further find that the company did not forbid them to do so on or prior to October 11, 1946,* then you may find the Northern States Power Company is responsible for the acts of negligence of John Vevea, that is if you find Vevea was negligent on October 11, 1946, and that such negligence was the proximate cause of the accident and death of Ida Rampi." (Italics supplied.)

One of the claimed objectionable features of the above charge is the statement by the court, "* * * and when I say John Hassler I mean also any other of the Power Company's officials." What the court was attempting to tell the jury was that if the company knew that meter readers used their own cars in the manner plaintiff claims they did, or if the meter readers used their own cars to such an extent that the company should have known that they were doing so on company business, the company would be responsible for the negligent acts of Vevea if such negligent acts were the proximate cause of the accident. Of course, the only way the company could know would be through its own officials, and if the private cars of meter readers were used to such extent that the company should have known of the practice, then the company, of course, should have known it only through its officials. In our opinion, this charge of the court was not so inaccurate as to constitute prejudicial error.

Another claimed error is the court's statement to the jury: "* * * and you further find that the company did not forbid them to do so *.* *." The company, in its brief, does not enter into any discussion as to why it considers this statement prejudicial. So we shall treat it in the same manner.

The company claims that the court erred in several other respects. We have considered them all. Seldom do cases come up here on a perfect record, but many claimed errors will be overlooked if they are minor and not prejudicial. So here, it would have been desirable if certain minor errors had not crept into the record. They were not, however, of such a character as to compel us to grant a new trial.

Admittedly this is a close case on several of its features, but in our opinion it should be affirmed.

Order affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.

