STATE v. EVELYN LORRAINE DIAMOND.

241 N. W. 2d 95.

April 9, 1976—No. 45204.

*C. Paul Jones*, State Public Defender, and *Gregory A. Gaut* and *Mark W. Peterson*, Assistant State Public Defenders, for appellant.

*Warren Spannaus*, Attorney General, *Gary W. Flakne*, County Attorney, and *Vernon E. Bergstrom*, *David W. Larson*, and *Michael McGlennen*, Assistant County Attorneys, for respondent.

Heard before Rogosheske, Yetka, and Amdahl, JJ., and considered and decided by the court en banc.

PER CURIAM.

Defendant appeals from the judgment entered pursuant to a jury verdict finding her guilty of manslaughter in the first degree, Minn. St. 609.20(2), for the stabbing death of her husband. Defendant primarily contends (1) that the evidence was insufficient to sustain the jury verdict; and (2) that prejudicial testimony was erroneously admitted about her prior assault with a knife on a friend of the decedent, her sexual advances toward one Patricia Helberg the night of the stabbing, and various incidents and quarrels between defendant and decedent during the 2 years preceding his death. We find no merit in these contentions or in other issues raised, and accordingly we affirm.

The evidence viewed most favorably to the verdict permitted the jury to find that on the evening of August 4, 1973, defendant was drinking at the home of her husband at 163 East Island, Minneapolis, with her husband and a friend of his, Michael Bohmbach. Defendant and her husband, although recently married, were not living together on a regular basis. The three drank beer and whiskey and smoked two marijuana cigarettes during the evening as they watched television in the living room. Around 11 p. m., Mrs. Patricia Helberg, a friend, joined the group. Shortly after her arrival, defendant began walking around the room and subsequently began making sexual advances to Mrs. Helberg by pulling at her clothes and propositioning her. Mrs. Helberg resisted

these advances, and although defendant was not easily dissuaded, she was finally rebuffed. Defendant made disparaging remarks about her husband's sexual ability and stated she could become a highly paid prostitute. This entire incident transpired within the sight and hearing of her husband and Bohmbach. Her husband did not interfere.

When the conversation and activity subsided, Mrs. Helberg departed, leaving Bohmbach in a chair and defendant and her husband on the couch. The late movie was on the television, and defendant appeared to be falling asleep. Bohmbach testified that he then went upstairs, began to feel dizzy, and went to his room and lay down. His remaining recollections of that evening were very hazy. Bohmbach remembered hearing, after some indeterminate interval, a conversation between defendant and her husband, with her husband saying, "Time for bed, Eva," and defendant saying, "Just let me alone." Sometime later, defendant entered Bohmbach's room in an agitated condition, attempted to turn on a lamp but failed, and left. Later she entered the room a second time, and when Bohmbach asked her not to turn the light on, she replied, "What's the use?" Then, after a disparaging remark, she abruptly left. When Bohmbach awoke the next morning, the investigating police were in the house, defendant was gone, and defendant's husband was dead.

Prior to the arrival of the police and around 2:30 a. m. that night, two friends, Patricia Hunsader and William McCusker, came to the house to visit defendant and her husband and observed an ambulance waiting outside. The driver told them he had been unable to gain entrance. He then left, and the couple climbed the side stairs and looked in the window to see if anything was wrong. They observed decedent's body on the floor and could see a knife wound in his chest. They immediately left and contacted the police, who arrived at the house shortly thereafter.

The next day, defendant, accompanied by her attorney, voluntarily surrendered to the Minneapolis Police. The police advised her of her Miranda rights, examined her alleged injuries, and took her statement. Her injuries consisted of a torn fingernail on her left hand, small lumps on the right side of her head, a small red mark on her left arm, and similar marks around her throat. No other bruises were apparent. Her written statement, in which she described her activities during the evening and her defense of accident, was admitted at trial.

Since defendant did not testify, her statement is the only direct account of the immediate circumstances surrounding the death of her husband. In the statement, defendant related that she fell asleep on the sofa and was awakened by her husband, who then tried to forcibly eject

her from his home. Because it was late, she insisted on sleeping there. Failing in her efforts, she attempted to call a friend to get a ride home but was unable to reach him. She then went upstairs to talk to her husband, who had gone to bed. He met her in the doorway of his bedroom and struck her in the stomach. Upon returning downstairs, she discovered that she was missing her eyeglasses and thought that she must have lost them when her husband had hit her. For protection, she picked up what looked to her like a bread knife and went back upstairs to get them. While she was looking for her glasses on the floor of his room, her husband grabbed her, pushed her down on the mattress, and hit her about five times on the side of her head as he held her down by the throat. She had dropped the knife to the floor when he grabbed her so as not to hurt him. She struggled, crying and hysterical, and he released her. She picked up the knife and turned to leave the room. At this moment, she saw him coming toward her with his arms outstretched. She held the knife straight out so he would stop, but the knife entered his chest as he lunged at her.

According to her statement, she then ran from the house in a panic and began to cross the bridge into downtown Minneapolis. A man stopped to pick her up and took her to a phone booth, where she called Hennepin County General Hospital to request that an ambulance be sent to her husband's address. She was then picked up by another man who took her to his apartment where she used his phone and listened to the police radio. She told this man that her husband had been beating her and that she had stabbed him with an overhand motion. Later, she was picked up by a friend and spent the remainder of the night in his apartment.

When the police investigated the scene of the stabbing, they found decedent lying face up on the floor next to his bedroom door with a 6-inch butcher knife under his right knee and defendant's eyeglasses under his right arm. Decedent's blood was on the bed, the sheets, and the door jamb. Decedent had .18 percent alcohol by weight in his blood at the time of his death as well as a full and tense bladder.

Dr. Garry Peterson, a forensic pathologist, examined decedent and the scene of his death. He testified that the weapon which caused the wound had entered decedent's chest horizontally at an angle of about 30 degrees to the right of the body from straight ahead. The injury was necessarily fatal and would have caused fainting within 15 seconds. Based on his internal and external examination of decedent, Dr. Peterson testified that it was most likely that decedent was seated on his bed at the time the wound was inflicted but acknowledged that it was possible that the wound could have been caused in the manner described

by defendant. Dr. Peterson also testified that decedent's bladder condition could indicate that the deceased was asleep just prior to his death or involved in an argument or something else which distracted him from his urge to urinate.

The jury by its verdict found that defendant caused the death of her husband while committing an assault with such force and violence that death or great bodily harm to the victim was reasonably foreseeable. Minn. St. 609.20(2). Viewing the evidence to support the jury's conclusion in the light most favorable to its verdict of guilt, State v. Loss, 295 Minn. 271, 204 N. W. 2d 404 (1973), we are compelled to assume that the jury believed the state's testimony and disbelieved that which contradicted it, State v. Ellingson, 283 Minn. 208, 167 N. W. 2d 55 (1969). A conviction based upon circumstantial evidence may be sustained against the presumption of innocence, however, only when the reasonable inferences from such evidence, viewed most favorably to the verdict, are consistent with the defendant's guilt and inconsistent with any rational hypothesis except that of his guilt. State v. Kotka, 277 Minn. 331, 334, 152 N. W. 2d 445, 448 (1967), certiorari denied, 389 U. S. 1056, 88 S. Ct. 806, 19 L. ed. 2d 853 (1968). Viewing the circumstantial evidence in this light, we are convinced that there was sufficient evidence for the jury to convict defendant notwithstanding her claim of self-defense or accident.

There was ample evidence from which the jury could conclude that on the night of the stabbing defendant, and not her husband, was the aggressor. Eight prosecution witnesses testified at trial about eight separate incidents in the preceding three years in which defendant had threatened her husband at various times with a knife, an axe, a meat cleavor, and a .22-caliber rifle. Decedent's tolerance of his wife's unusual behavior during these incidents and during the early evening of August 4, as well as Bohmbach's testimony that decedent said only, "Time for bed, Eva," that evening, all negated defendant's claim of self-defense or accident and afforded the jury a reasonable basis to find intent. Defendant's claim that decedent twice verbally and physically abused her in his room so that she cried loudly and hysterically was impliedly disputed by Bohmbach's testimony that he heard nothing in the next room. If, as we must assume, the jury believed Dr. Peterson's testimony that the physical evidence in decedent's bedroom and the nature of the fatal wound indicated that he was probably seated at the time of the stabbing, then defendant's assertion of accident or self-defense could rationally be discredited by the jury and the presumption of innocence overcome.

Defendant argues that it was error to allow Michael Bohmbach to testify about a prior assault by defendant on Bohmbach over a year before the stabbing death of her husband. In that incident, defendant had become angry with Bohmbach, grabbed a 5-inch knife, and stabbed Bohmback in the right hip. In State v. Flowers, 262 Minn. 164, 114 N. W. 2d 78 (1962), we held that it was error for the prosecutor to cross-examine a defendant, charged with assault, about other unrelated assaults involving different persons. Defendant contends that introduction of testimony about her assault on Bohmbach clearly violates the rule set forth in Flowers. We disagree.

It is axiomatic that the state cannot use evidence of prior misconduct to establish an assaultive propensity on the part of the defendant. See, 1 Wigmore, Evidence (3 ed.) §§ 193, 194. In our opinion, however, evidence of defendant's assault on Bohmbach was offered and admitted here not to prove defendant's bad character but to help illuminate defendant's relationship with the decedent. Decedent was present in the house where Bohmbach was stabbed by defendant and witnessed defendant throw whiskey in Bohmbach's eyes and break a whiskey bottle over his head. Despite this gross misconduct by defendant in assaulting a good friend of his, decedent remained calm and did nothing violent toward his wife, the defendant. Evidence of this incident with Bohmbach and decedent, therefore, was directly relevant in discrediting defendant's statement that decedent was the violent aggressor on the night of his death and that she acted only in self-defense. Where intent or self-defense is the controverted element of the crime, evidence of the prior relationship between defendant and decedent may be admitted to prove intent. See, State v. Boyce, 284 Minn. 242, 260, 170 N. W. 2d 104, 115 (1969).

While it is apparent that evidence of the Bohmbach incident carried with it the danger of undue prejudice to defendant, we do not believe the trial judge abused his discretion in finding that the probative value of the evidence exceeded the risk of such prejudice. The jury was warned of the limited purpose for which this evidence was received, in accordance with State v. Billstrom, 276 Minn. 174, 149 N. W. 2d 281 (1967), both before testimony of the Bohmbach incident was admitted and in their final instructions. For the reasons set forth above, we also find that testimony about eight other incidents in the preceding three years in which defendant threatened decedent with various weapons was also admissible in the discretion of the trial court under the intent and absence-of-mistake exceptions to the general rule barring evidence of prior misconduct by the defendant. See, State v. Rediker,

214 Minn. 470, 8 N. W. 2d 527 (1943); State v. Sweeney, 180 Minn. 450, 455, 231 N. W. 225, 227 (1930).

Defendant also objects to the introduction of testimony about her sexual advances to and indecent liberties with Patricia Helberg prior to the stabbing. Defendant asserts that evidence of her homosexuality so shocked the jury that it made a fair trial impossible. We have recently held, however, that evidence of a defendant's homosexuality may be admissible despite its potential prejudicial impact if it is important and relevant evidence relating to the crime charged. State v. Schweppe, 306 Minn. 395, 237 N. W. 2d 609 (1975). Here, it was justifiable to establish decedent's and defendant's probable states of mind at the time of the stabbing by evidence of the Helberg incident since state of mind and probable behavior were made crucial facts in issue by defendant's plea of self-defense. Testimony about the Helberg incident, as well as the testimony about the incidents in which defendant had threatened decedent, tended to establish that decedent had been tolerant and patient toward defendant. The jury was entitled to consider that evidence in determining the credibility of defendant's claim that decedent had been the aggressor just before the stabbing.

We have carefully considered all other errors alleged by defendant and find them to be without merit.

Affirmed.