STATE of Minnesota, Respondent,

v.

Bourke John LANGLEY, Appellant.

No. C8–83–1122.

Supreme Court of Minnesota.

Aug. 17, 1984.

C. Paul Jones, Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas Foley, Ramsey County Atty., St. Paul, for respondent.

AMDAHL, Chief Justice.

Rose Marie Langley's body was found face down in the bathtub of her home on the morning of August 31, 1982. She was clothed in a bathrobe, nightgown, and slippers. An electric hair-curling appliance with rollers on heater prongs was underneath her in the muddy bath water at the bottom of the tub, and two rollers were loose in the water. Her estranged husband, Bourke John Langley, was indicted for murder in the second degree on November 3, 1982, in violation of Minn.Stat. § 609.19(1). He entered a plea of not guilty at his arraignment on November 12, 1982. A Rasmussen hearing was waived and trial by a jury of twelve was held in Ramsey County District Court. The state alleged that Rose was drowned by Bourke, who then placed the curling appliance in the water to make her death appear accidental. Bourke alleged that Rose died of accidental electrocution. After a finding of guilty as charged, Bourke was sentenced on June 16, 1982, to a term of 121 months executed with 41 days of jail credit.

In this appeal, Bourke argues that the admission of cumulatively prejudicial hearsay evidence, the improper cross-examination of a defense pathologist, and the inflammatory "law. and order" final argument of the prosecution constituted reversible error. Further, Bourke avers the circumstantial evidence presented at trial was insufficient to support the verdict of guilty of murder in the second degree. We affirm.

The sequence of events leading to Rose's death occurred on the morning of August 31. At 7:40 a.m., Robert Johnson, a next-door neighbor, called for Rose's 13-year-old son, Chris Murphy, and the two left for school. Bourke and Rose were seated at

the breakfast table, Bourke in a brown robe and Rose in a blue robe. Neither of the boys noticed any bruises on Rose and she did not complain of any. From 7:40 to 8:30 a.m., the only persons present in the home were Bourke and Rose; hence, the events that took place during that time are adduced from circumstantial evidence. However, from 8:30 to 10:10 a.m., when Rose was declared dead, numerous other persons were in contact with Bourke. They testified at trial, creating the following uncontroverted scenario.

At 8:30 a.m. Bourke arrived to inspect an apartment that he had arranged to rent. The apartment was a 2-minute 20-second walk from Rose's home at 2425 Castle Avenue in North St. Paul. Joel Nelson, who had risen at 8:15 that morning, began to clean the apartment at 8:25 a.m. Nelson checked his new watch when Bourke arrived because he was not expected until 9 a.m. It was 8:30 a.m. Bourke stayed approximately 3 to 4 minutes. Nelson did not notice anything extraordinary about Bourke's demeanor or appearance. Bourke left the apartment at approximately 8:34. A 2-minute 20-second walk would have put him back at Rose's house at 8:36.

Bobby Johnson's mother, Paula, was washing breakfast dishes in her home when she heard Bourke calling her name. She went to the back door and saw Bourke gesturing and calling, "Paula, come here, I need your help." She looked at the clock, which read 8:40 a.m., and told her other son, who usually left for school at 8:45, to stay home until she returned. She then ran next door, called to Bourke, and heard the sound of splashing water. From the hallway outside the bathroom she saw Bourke lifting Rose out of the bathtub. She saw no bruises on Rose's body. Bourke brought Rose into the hallway and placed her on the floor, with her head in the bedroom and her feet near the bathroom door. Paula could not find a telephone, so she ran to her home and called

the North St. Paul Police Department. The call was logged at 8:40. Officer Scott Steffen arrived at 8:41, administered oxygen, rolled Rose over, struck her back four times to clear an airway, and instructed Bourke in C.P.R. chest compressions. Officer Steffen observed no bruises on Rose at that time. Bourke told the officer that he had gone for a walk and returned to find his wife in the tub. He said, "It looks like she had an accident."

An ambulance arrived at 8:47. Rose, accompanied by Bourke, was taken to St. Paul Ramsey Medical Center in a state of cardiac arrest. Despite resuscitation efforts, she died at 10:10 a.m. The emergency room physician observed multiple bruises on her body, lateral to her left eye and on her left thigh. There were abrasions on her lips and within her mouth, in addition to wounds caused by the paramedics in establishing an I.V. and an intertracheal airway. Apparently one of the ambulance personnel, or perhaps Bourke, told Dr. Richard Lamon that Rose was found in the bathtub with a hair-curling appliance. Dr. Lamon tentatively assigned the cause of death as drowning or electrocution.

Officer Steffen searched the home; he found Rose's identification and $144 in her purse in the bedroom. He found no signs of forced entry.[1]

After Lieutenant Gerhardt Brandt arrived, the two drained the tub of its brownish, opaque water and found the bottom half of the electric hair-curling appliance. The electric cord to the hair-curling appliance was plugged into a light socket next to the sink and opposite the tub, and the other end was dangling onto the floor. A bar of soap and a squeeze bottle of shampoo were floating on the surface of the water, and a spring loaded shower curtain had collapsed into the water. A cup of coffee, shampoo, deodorant, and Bourke's shaving kit were on a tray between the sink and the toilet. The toilet seat cover was soaking wet, and the bathroom floor

---

1. Steffen heard the clothes dryer running with a clunking noise coming from it, opened the dryer, and saw and felt some warm, dry, dark-colored rags. These were never retrieved or identified.

was wet, with muddy tracks. The top of the hair-curling appliance, which contained a mirror, was propped between the toilet seat and the tank behind.

At 2:30 p.m., Lieutenant Brandt drove Bourke from Rose's father, George Klein's home to the Castle Avenue address. Brandt noticed three parallel, horizontal scratches on Bourke's neck that looked like fingernail scratches.[2] Bourke explained that upon his return from inspecting the new apartment he had walked past the family's Winnebago camper and remembered that Rose had complained about a leak in the roof. He claimed that he climbed a tree at the side of the camper and checked the roof. On his way down, he slipped on the tree and scratched his nose and neck. He said he then went into the house to look for Rose, and when he found her in the bathtub, he ran to the back door and called to Paula for help. He then went back to the bathroom and got into the tub to try to lift Rose out.[3]

A significant amount of evidence presented at trial discredited Bourke's explanation of his activities during the crucial hour. First, Officers Brandt and Steffen inspected the Winnebago on September 1, 1982. They saw numerous partial footprints on the roof, on the vent, on a broken piece of the vent, and just below the lip of the windshield. No casts were made of the prints, and there was no attempt to ascertain to whom they belonged. But Chris Murphy and Robert Johnson testified that they had occasionally climbed the tree to reach the roof of the Winnebago to retrieve a basketball. Bourke claimed he learned how to climb the tree to get onto the roof by watching the boys.

Second, on November 8, 1982, when Lieutenant Brandt wanted to get onto the roof of the Winnebago, Bourke, rather than using the tree or climbing onto the front of the camper, went to the garage nearby and got a stepladder. Bourke claims this was because he was wearing dress pants and loafers rather than tennis shoes, as on the morning of Rose's death. Chris testified that he had never heard his mother complain of a leak in the roof of the camper, which had not been used for over a year.

Third, the footprints on the front of the Winnebago, near the bumper and the lip of the windshield, indicated another probable route of access, perhaps easier for a middle-aged man than climbing a tree.

Fourth, a BCA Criminologist removed and analyzed Rose's fingernails and found human blood under all three middle fingers of Rose's left hand and under one of the middle three fingers on her right hand. The samples were compared with blood and saliva samples from Rose and Bourke but could not be typed for positive identification. The link to the scratches on Bourke's neck is inevitable and more probable than his explanation of his scratches.

Given the time frame established by the other witnesses, Bourke would have to have climbed the Winnebago, fallen down, found his estranged wife in the tub, and summoned Paula, who telephoned the police department within 4 minutes (between 8:36 and 8:40). It is highly improbable that this is a true picture of the events that occurred.

But in the 50 minutes between 7:40 when the boys left for school and 8:30 when, according to Joel Nelson, Bourke arrived at the apartment, there was enough time for Bourke to have assaulted his wife, changed his clothes *and* climbed the camper if, indeed, he did so. Because Joel Nelson and

---

**2.** Photographs of the scratches were not taken until days later, when the scratches were not as distinct. Klein joined Bourke at the hospital and also noticed Bourke had three scratches (which he described at trial as fingernail marks) on the right side of his neck, running from below his ear to his Adam's apple, and a fresh scratch or skinned mark on his nose and that Bourke was limping. Bourke explained that he had fallen out of a tree. Klein bent down to check Bourke's ankle and insisted that the ankle be x-rayed, but no damage was found.

**3.** Rose's father saw that Bourke's pants were wet to the knees but that his tennis shoes and socks were dry. These facts conflict with Bourke's story that he got into the bathtub to try to rescue Rose, but no explanation was established at trial.

Paula Johnson had specific reasons for noting the time, and because Bourke has a vested interest in his particular time frame, the jury had substantial grounds to doubt the veracity of Bourke's story.

A post-mortem performed by Dr. Michael McGee revealed twelve bruises on Rose's body, excluding those caused by resuscitation attempts, that is: perforation wounds caused by the I.V., bruised lips caused by the placement of the tracheal tubes, and a broken sternum caused by C.P.R. Large bruises were noted on her left elbow, left palm, right elbow, right knee, right ankle, outer left thigh, right shoulder blade, and on her scalp, on the left rear side of her head, above her ear. In addition, Rose had a black left eye, a severely bitten tongue, multiple scratches on the back of her right hand, and fingerprint bruises caused by the pressure of a hand on her left forearm. All of the bruises were fresh and had been inflicted at or near the time of death; none was fatal. Dr. McGee admitted that the bite marks on her tongue might have been from the clamping effect that occurs during electrical shock, but he concluded that the rest of the bruises had been caused by a series of blows from a blunt instrument, possibly a hand, fist, or foot. He discounted an accidental fall because the bruises were on flat, hidden body surfaces, not bony protuberances. Also, Dr. McGee thought the bruises were severe enough that if Rose had fallen, she would have sought medical help and not gone into the bathroom to curl her hair.

Dr. Gary Peterson, Assistant Hennepin County Medical Examiner, testified for the state that the pattern of bruises on decedent's body was not consistent with a slip or a fall downstairs or with accidental drowning because bruising in conjunction with bathtub drowning is uncommon.

As the state points out in its brief, even the defense's forensic pathologist, Dr. John Plunkett, agreed that the bruises were "doubtless" the result of a beating administered at or about the time of her death.[4] In sum, all three experts agreed that Rose had been battered shortly before her death but that the battering was not the cause of death.

Bourke denied having battered Rose on the morning of August 31. When asked how Rose got the black eye, Bourke said that he remembered her face hitting the door frame after he pulled her out of the bathtub, as he laid her on the floor.

All of the experts also concluded that it was medically impossible to tell to a certainty from the autopsy alone whether Rose died from drowning or from electrocution. Dr. McGee based his opinion that Rose's death was a homicide by drowning on the fact that her lungs contained a fairly large amount of water. She also had a "congested appearance or bluish purply color" on the soft tissues of her face, a phenomenon often seen in people who have drowned. But he agreed with the other experts that a diagnosis of drowning is very difficult to make, the lungs fill with water due to many different types of death. There were no electrical burn marks on Rose's body, and that is apparently not unusual with low-voltage electrocution, especially under water. Nonetheless, Robert Svare, an electrical engineer, testified for the state that if Rose had reached with one hand for the faucet and with the other hand for the rods there would have been burn marks or destruction to the tissue of the hand on the faucet if she had been electrocuted.

The forensic pathologists, Drs. McGee and Peterson, attempted to reconstruct the scene in the bathroom to determine how

4. The fact that the bruising was not noted by any of the persons involved in finding or trying to revive Rose was explained by Dr. McGee. If a person has been struck and dies shortly thereafter of another cause, the heart stops, the blood no longer flows, and a bruise will not form. But, if the heart is resuscitated and the blood begins to flow, it will leak out of the damaged vessels and cause bruising. Dr. Plunkett agreed that the outward appearance of a bruise may be caused by events, such as the application of life-saving measures, that happen to the body after death. He added that when a body is moved after death "[s]imply the settling of blood by gravity * * * will allow the bruises to show up."

Rose, who was still in her night clothes, landed face down in the bathtub. They also relied on reports written by an electrical and human factors engineer in concluding to a reasonable medical certainty that Rose had expired by freshwater drowning that was homicidal not accidental.

Dr. Plunkett relied on the report of defendant's electrical engineer and Rose's medical history of hyperventilation syndrome, which he believed might have caused her to faint or fall if her carbon dioxide levels got too low, in concluding that the manner of death was "accident homicide undetermined."

The crucial differences in professional opinions were between the two electrical engineers: Robert Svare, who testified for the state, and Keith Champlin, who testified for the defense. Svare conducted tests and determined that the hair-curling appliance was in good operating condition and did not produce a current sufficient to have caused Rose's heart to fibrillate and to have killed her. Svare concluded that it was unlikely that Rose had been curling her hair while sitting on the bathtub, with the hair-curling appliance either on her lap or balanced on the edge of the tub. He also stated that the curling appliance was not heavy enough, even when full of water, to require persons to brace themselves when picking it up.

Champlin conducted his own tests and determined that if Rose had touched the faucet with one hand and come within an inch of the heating rods upon which the rollers rested with the other hand, and if the polarity of the plug were reversed, a circuit of current capable of killing her would have been completed. It appears from their testimony that the two engineers were actually in substantial agreement. Svare did not conceive of Rose's having grabbed the heating rods once the appliance had fallen into the water. Since the appliance was light weight, it would have floated initially and, as it sank to the bottom, the cord, which was not long enough to reach the bottom of the tub, would have disconnected, thus shutting off the current. To be electrocuted, Rose would have had to touch the rods at the same moment the appliance was floating. The odds against Rose having grabbed for the appliance in exactly the manner described by Champlin would have been very great.[5]

Chris testified that when his mother was not preparing to go to work, as was true on August 31, she would curl her hair in front of the television. Otherwise, she would take her coffee into the bathroom, place the curling appliance on the tray between the toilet and the sink, sit on the tub, and look into the mirrored top while curling her hair. Bourke, in contrast, stated that Rose would set the curlers on the stool of the toilet. He had never seen her balance the curlers on the edge of the tub. Although not preparing for work, Rose did have an appointment with a chiropractor at mid-morning on August 31. The defense tried to suggest that since Bourke's shaving supplies were on the table, she might have held the appliance on her lap or tried to balance it on the rounded edge of the old-fashioned tub. This would have been precarious and is not a rational hypothesis. All the investigators who tried to see into the mirror (in the position in which it was found) while sitting on the tub were unable to do so.

1. The defense contends on appeal that the circumstantial evidence presented at trial was insufficient to support the jury's finding that Bourke Langley was guilty of murder in the second degree beyond a reasonable doubt.

We must determine, in reviewing a sufficiency of the evidence question, if a jury could reasonably conclude, under the facts and any legitimate inferences, that the defendant was guilty. *State v. Mer-*

---

5. The defense presented evidence to try to show a faulty electrical system in the house. In the spring of 1982, an electrician had been called to the house to repair the wiring. One could receive a shock from touching the screen door and the water pipe in back of the house. The problem was repaired and had never affected the bathroom in any case.

*rill,* 274 N.W.2d 99, 111 (Minn.1978). The evidence is viewed in the light most favorable to the prosecution. *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980). Nevertheless, a conviction based on circumstantial evidence may only be sustained when the reasonable inferences from the circumstantial evidence are consistent with the defendant's guilt and inconsistent with any rational hypothesis except that of his guilt. *State v. Diamond,* 308 Minn. 444, 447, 241 N.W.2d 95, 98 (1976) (per curiam).

■ In this case the weight of the circumstantial evidence, viewed in the light most favorable to the prosecution, is inconsistent with any rational hypothesis except that of defendant's guilt. All of the experts agreed that Rose was severely beaten just prior to her death. The blood under her fingernails, under three on one hand and under one on the other hand, is consistent with the marks on Bourke's face and neck as noted by numerous witnesses. The inference that Rose scratched Bourke in self-defense is buttressed by the fact that his story about climbing onto the roof of the trailer and scratching his neck on a branch does not withstand scrutiny. There was not enough time in the framework established by the other witnesses for him to have climbed up and inspected the roof. It is difficult to imagine that Bourke climbed the tree rather than taking the easier route up and down the front of the trailer or rather than using the ladder nearby. The soaking wet toilet seat cover supports the state's theory that Bourke used the cover to hold Rose under the water and drown her.[6]

The water in Rose's lungs, the edema in her face, the lack of burn marks, and the likelihood that not enough current was generated by the hair-curling appliance for death to result under these facts are perhaps insufficient individually to establish

cause of death. The cumulative effect of all these circumstantial facts, however, negates any rational hypothesis except that of Bourke's guilt.

2. At trial, the defense objected to admission of the evidence of Bourke's assault on Rose in 1978 prior to their marriage and extensive evidence of "hearsay allegations" of subsequent assaults. The defense asserted that the evidence lacked relevance, was cumulatively prejudicial hearsay, and that its admission violated the confrontation clause of the sixth amendment to the federal constitution, applicable to Minnesota under the fourteenth amendment. *See State v. Hansen,* 312 N.W.2d 96, 102–103 (Minn.1981).

Rose and Bourke were married in California in March 1979, each for the second time. Rose's son (Chris), three of Rose's friends, Rose's counselor, and a police investigator from California all testified to a series of incidents of abuse and threats against Rose over the years. Rose was hospitalized twice with severe injuries and twice she obtained restraining orders to prevent Bourke from coming to the house.

Bourke denied, at trial, all the incidents of abuse except the one in California in 1978. He blamed the abuse on his excessive drinking, which he claimed had stopped. Another two episodes when Rose was hospitalized were explained by Bourke as having been accidental. Bourke admitted, however, that he, Rose, and Chris participated in a Domestic Abuse Prevention Program in 1980–1981 and that he received a diploma from the program despite the fact that, according to Rose's friends, the abuse was continuing.

■ The state cannot present evidence of prior misconduct, termed *Spreigl* evidence, to establish a defendant's assaultive propensity. *Diamond,* 308 Minn. 444, 448, 241 N.W.2d 95, 99.[7] Nor is such evidence

---

**6.** Bourke seemed very anxious to have others know about the presence of the hair-curling appliance in the water. He told the ambulance drivers and Paula Johnson that it may have caused Rose's death and that he may have knocked the plug out as he reached for Rose.

In fact, the cord was not long enough to reach to the bottom of the tub and would have disconnected on its own.

**7.** In *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 267 (1965), evidence of other crimes or misconduct on the part of a defendant was held admis-

admissible to prove a defendant's guilt of the crime charged. *State v. Titworth,* 255 N.W.2d 241, 244–46 (Minn.1977). Evidence that pertains to the relationship between a defendant and a homicide victim, however, is admissible in criminal prosecutions even if it refers to other crimes. The admissibility of this type of evidence for the purpose of showing motive and the history of the relationship with the victim is well established.[8] *See State v. Salas,* 306 N.W.2d 832, 836 (Minn.1981); *Diamond,* 308 Minn. 444, 448, 241 N.W.2d 95, 99; *State v. Boyce,* 284 Minn. 242, 260, 170 N.W.2d 104, 115–16 (1969). Especially where a defendant has "suggested that the injury which caused the death had been accidental," as Bourke has alleged, the *Spreigl* evidence of frequent beatings is properly admitted to aid the jury "in reconstructing what caused the victim's injuries." *State v. Broda,* 318 N.W.2d 239, 240 (Minn.1982). In this case, the evidence of the prior assaultive relationship was necessary to explain the bruising, that all of the experts agreed was inconsistent with drowning or falling.

The defense's claim that the prior assaults were too remote in time to be relevant to the issues in this case is negated by the phraseology of the exception itself: the "history" of the prior relationship is admissible. The facts in the case establishing this exception are remarkably similar to the facts presented here. In *State v. Rediker,* 214 Minn. 470, 8 N.W.2d 527 (1943), the evidence was of a pattern of abusive conduct lasting over several years. The evidence was held admissible to "show a course of conduct and a mental attitude of the defendant toward his wife, and to show

malice." 214 Minn. at 481, 8 N.W.2d at 533 (citations omitted). In *State v. Moyer,* 298 N.W.2d 768 (Minn.1980), admission of a prior offense 20 months earlier against a person other than the victim was admissible because that person was a girlfriend of the defendant's, as was the victim. Contrary to Bourke's assertion, the *Diamond* case also admitted remote events (testimony about eight other incidents in the preceding 3 years) under the intent and absence-of-mistake exceptions to the general rule barring evidence of prior misconduct. 308 Minn. at 448, 241 N.W.2d at 99.

The leading case of *State v. Billstrom,* 276 Minn. 174, 149 N.W.2d 281 (1967), established standards that must be met before evidence of prior misconduct covered by an exception may be admitted. In *Billstrom* the ground for admissibility was for the purpose of establishing identity. 276 Minn. at 176–79, 149 N.W.2d at 283–85. This ground also applies to the immediate case because the defense tried to imply at trial that Rose's boyfriend, Larry Frederick's whereabouts the morning of the murder should have been investigated further. "Where identity is a crucial issue and an alibi is strongly relied on by the defense, the state has a right to fortify its position with evidence that the crime committed by defendant was a part of a series of similar, related offenses." *Billstrom,* 276 Minn. at 177–8, 149 N.W.2d at 284 (footnotes omitted). Bourke, according to the evidence presented, constructed an alibi to the effect that during the hour within which Rose was killed, he was climbing the roof of the trailer and then inspecting his new apart-

sible but with extreme caution and appropriate safeguards. In particular, a prior history of sex offenses against the same victim and of the same or similar character was held to give rise to a strong inference that the same relationship continued and characterized the conduct, inclination, and disposition of a defendant toward the victim. The trial judge in the instant case expressed the opinion that a prior history of assault in a circumstantial evidence case is not *Spreigl* evidence at all but has an independent relevancy all its own. Whether or not such evidence is *Spreigl* evidence is unimportant because, as we decide *infra,* the *Billstrom* stan-

dards for admissibility of *Spreigl* evidence are met in this case.

8. Under *State v. Blanchard,* 315 N.W.2d 427, 431 (Minn.1982), even the evidence that Bourke had assaulted Chris Murphy, Rose's son, was admissible; "evidence of a defendant's assaultive conduct toward a third party related to * * * the victim is generally admissible both to show 'a highly strained relationship' between the defendant and the victim and establish a motive and premeditated intent on the part of the defendant to kill the victim." 315 N.W.2d at 431.

ment.[9] We hold that the trial court's decision to admit evidence of prior assaults was not an abuse of discretion.

■ 3. The testimony of several witnesses contained hearsay accounts by Rose to her friends about prior assaults. The trial court admitted the hearsay pursuant to Minn.R.Evid. 804(b)(5), which is "the residual exception for statements that do not fit within one of the traditional exceptions to the hearsay rule." *State v. Hansen*, 312 N.W.2d 96, 101 (Minn.1981) (footnote omitted). In addition to notice to one's adversary and the unavailability of the declarant, the statement must have circumstantial guarantees of trustworthiness, be offered as evidence of a material fact, be more probative on the point than any other evidence which could reasonably be procured, and must serve the interests of justice and the purposes of the rules. In particular, the requirement of sufficient guarantees of trustworthiness should be carefully examined. 312 N.W.2d at 101–02. Obviously Rose was not under oath when she spoke to her friends and counselors.

■ Hearsay statements which are strongly corroborated by factors having equivalent circumstantial guarantees of trustworthiness have been held to meet Rule 804(b)(5)'s threshold trustworthiness requirement. *See United States v. Ward*, 552 F.2d 1080, 1083 (5th Cir.), *cert. denied*, 434 U.S. 850, 98 S.Ct. 161, 54 L.Ed.2d 119 (1977). The witnesses who testified actually saw Rose's bruises and her fearful behavior, thus corroborating the statements Rose made to them. All the incidents of injury to Rose, related by the witnesses, were admitted by Bourke, albeit with explanations that they were accidental. Bourke's descriptions of Rose's injuries corroborated the descriptions given by the witnesses at trial. The hospital reports and the restraining orders provide further corroboration. Finally, a number of the reports of battering were made under the "stress of excitement caused by the event or conditions." Minn.R.Evid. 803(2). These are admissible under Rule 803(2), whether or not the declarant is available.

4. Although we hold that the hearsay accounts of prior assaults were admissible under the residual exception to the hearsay rule, much of that hearsay dealt with Rose's fear of Bourke and that portion raises special concerns.

■ In *State v. Blanchard*, 315 N.W.2d 427 (Minn.1982), we adopted the rule that hearsay evidence concerning a homicide victim's fear of a defendant is admissible only when three conditions are satisfied:

1. The victim's state of mind must be relevant and is only relevant where a defendant raises the defense of accident, suicide, or self-defense.

2. The trial court must weigh the probative value of the evidence against the risk of unfair prejudice.

**9.** The *Billstrom* court dictated a set of procedures to be followed in future *Spreigl* cases. All have been met in this case:
　　a. Notice was given to the state.
　　b. The prosecution specified the exception under which the evidence was admissible, *i.e.,* intent, identity, motive, and absence of accident.
　　c. There was a relationship in time (as recently as a few months before Rose's death); location (within the home); or *modus operandi* (previous batterings produced similar bruises, such as the fingerprint marks and the black eye found at death).
　　d. Circumstantial evidence of defendant's identity was weak because there were no witnesses to the crime, so the evidence was necessary to support the state's burden of proof.
　　e. The evidence of Bourke's participation in the previous batterings was supported by clear and convincing evidence; *i.e.,* the police report of the California beating, the two restraining orders, the medical records at St. Paul Ramsey Hospital where Rose complained that her husband was a wife batterer, the family's attendance at counseling for spousal abuse, and the testimony of witnesses as to bruises they actually had seen.
　　f. The court repeatedly admonished the jury in unequivocal language that the testimony was received for a limited purpose and not to establish guilt. The trial judge twice said, "You may therefore, consider the evidence of any alleged other occurrence only as such evidence may bear on the limited purpose for which it is allowed. You must not convict the defendant for any other occurrence for to do so would result in unjust punishment."
276 Minn. at 176–79, 149 N.W.2d at 283–85.

3. A proper limiting instruction must be given.

315 N.W.2d at 432.

Bourke Langley's entire defense is that of accidental drowning. Bourke takes the position that the exception admitting evidence of the victim's fear of defendant where a defense of accident is raised applies only where the defendant claims to have committed the crime by accident and not where, as in this case, defendant claims not to have been present when the victim accidentally died. We have not and we will not so limit this exception.

Other jurisdictions have also declared that state-of-mind hearsay would be relevant and admissible where the acts or conduct of the declarant victim immediately preceding death were in dispute. *See People v. Arcega*, 32 Cal.3d 504, 186 Cal.Rptr. 94, 651 P.2d 338 (1982); *People v. Ireland*, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580 (1969). Rose's conduct was clearly at issue. As in *Lenza v. Wyrick*, 665 F.2d 804, 811 (8th Cir.1981), "the circumstances surrounding [her] * * * death were consistent with a possible homicide or accidental death. * * * From the testimony the jury could infer that [she] * * * did not get into the bathtub of her own volition."

The California case of *People v. Lew*, 68 Cal.2d 774, 69 Cal.Rptr. 102, 441 P.2d 942 (1968), stated that the victim's state of mind "clearly would have been placed in issue had the police investigation produced any evidence of a struggle preceding her death * * *." 68 Cal.2d at 779, 69 Cal.Rptr. at 105, 441 P.2d at 845. The severe bruising to Rose's body indicated a struggle prior to her death, and her fear of Bourke is relevant to that struggle and to her actions just before she died. The first prong of the *Blanchard* test has been met.

Under the second prong the trial court, even with the defense of accident, still had to weigh the potential for preju-

dice created by the cumulative effect of the California threat and Rose's letter. In *State v. Ulvinen*, 313 N.W.2d 425, 427–28 (Minn.1981), when the state of mind of the deceased was not in issue, such statements were prejudicial error, likely to lead the jury to conclude that the deceased was afraid of her mother-in-law and that therefore defendant probably disliked her enough to kill her.[10] Similarly, the danger that the jury might conclude from Rose's fear of Bourke that he killed her clouds the question of the admissibility of some of the hearsay evidence because of its potential for prejudice. After the severe beating in California, Rose told Bourke's first wife, Donna, as well as the police investigator, that Bourke had threatened that if they called the police he would take her and Chris out to the desert and bury them where no one would find them. Rose also told Donna that there was not a room in the house without her blood in it. Donna did not witness any abuse or any bruises.

Of even greater potential for prejudice was a sealed envelope Rose gave to her friend, Linda Stanton, in November of 1981 with instructions to take it to the police if anything happened to her. Rose told Linda that even if it looked like an accident, it was not, that Bourke would have done it and the letter would prove it. Linda delivered the sealed letter to the police. Entitled her "Last Will and Testament," it provided:

> I, Rose Klein Langley, being of sound mind and body, do hereby state that all of my belongings and holdings of any kind, are to go to my son, Christopher George Klein Murphy upon my death. I do also state that threats against my life have been made by Bourke John Langley, Social Security No. 215–46–6462. I authorize full openings of my records and dealings with Mr. Langley in the

---

**10.** The hearsay at issue on appeal in *Ulvinen* was admitted under the state of mind exception to the hearsay rule whereas, in the instant case, the hearsay was admitted under the residual exception. However, it is the nature of the particular evidence and not the specific rule under which that evidence was admitted that is determinative of the type of analysis that we employ.

event of my death. I hereby sign, Rose Marie Langley, 2–29–80.

In addition Linda Stanton testified that Rose had called her, frightened and crying, a week before Rose's death and said that Bourke had told her that if she valued her life, he had better not ever see or hear of her being with Larry Frederick again.[11] Linda had seen evidence of abuse on prior occasions. She did not see any in connection with this last threat or with the letter.

Support for the trustworthiness of this last threat is found in Bourke's own admission that he wiretapped Rose's telephone conversations at least once with Larry and once with either Larry's or Rose's mother. The evening before Rose's death, Bourke met his friend, Jerry Brown, at a restaurant. Bourke told Brown about the wiretapping and about his feeling confused and upset with Rose. Brown testified for the defense that after 2½ hours of conversation Bourke was calm and felt good. But on cross-examination Brown said Bourke had spoken candidly about having abused Rose and, despite having worked on his temper in the Domestic Abuse Project, he did not have it under control. Bourke told Brown, "Behind these baby blue eyes is an animal." In the face of all of this evidence of jealousy on Bourke's part, the risk of unfair prejudice caused by this last threat is minimal.

Thus only two pieces of hearsay evidence did not bear the same circumstantial guarantees of trustworthiness as did the other hearsay evidence and contained potential for prejudice. The letter and the threat made in California address the subjective fears of the victim, and the defendant argues that under the *Ulvinen* decision their potential for prejudice outweighs their probative value. While we conclude it would have been better not to have admitted this evidence, we cannot say its admission was an abuse of discretion. Moreover, the circumstantial evidence against Bourke was

sufficient to convict without the testimony about Rose's fears. As in the *Blanchard* case, the state of mind evidence was not crucial to the verdict and its admission does not constitute reversible error.

■ 5. Though we deem the hearsay statements admissible under the state of mind and the residual exceptions to the hearsay rule, they must be analyzed in light of the requirements of the confrontation clause of the sixth amendment, which is made obligatory on the states by the fourteenth amendment. *See Pointer v. Texas,* 380 U.S. 400, 403 (1965). The necessity of the declarations and their reliability must be examined. The necessity requirement is met when the declarant, in this case Rose, is unavailable. *See Hansen,* 312 N.W.2d at 102. The traditional indicia of reliability, *i.e.,* statements made under oath and subject to cross-examination, are missing here. The California threat related by Rose to Donna and to the police officer is the type of *ex parte* comment that has traditionally been considered inherently untrustworthy.

Nonetheless, we held, in *State v. Olson,* 291 N.W.2d 203, 207 (Minn.1980), that a defendant who procures the absence of a witness by threats, bribes or intimidation is precluded from asserting his right of confrontation. Similarly, a defendant who silences a witness by more drastic means should not be afforded the protection of the confrontation clause. Bourke cannot invoke his sixth amendment rights as a shield to protect him from the ramifications of having murdered his wife, Rose, because the evidence is strong that he has been the instrument of the denial of his own right of cross-examination. *Cf. United States v. Carlson,* 547 F.2d 1346, 1357–59 (8th Cir. 1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

---

**11.** Larry Frederick had been Rose's boyfriend for 4 to 5 months. Bourke claims that he was not aware that Rose's relationship with Larry was anything more than a friendship until he was given her diary after her death. Bourke also denied having threatened Rose with regard to Larry. Rose met Larry for lunch, with Bourke's knowledge, on August 30. Bourke even asked Larry, who was a mechanic, to look at his car that afternoon.

6. Bourke asserts that he was denied a fair trial by virtue of the prosecution's use of prejudicial, premature argumentation to elicit opinion testimony from his forensic pathologist that amounted to either a legal analysis or a mixed legal and factual analysis. Dr. Plunkett had expressed the opinion that the manner of Rose Langley's death, whether by accident or by homicide, could not be determined to a reasonable medical certainty. Bourke is correct in stating that as a condition to ultimate opinion testimony being admitted under Rule 704, the witness must be qualified and the opinion must be helpful to the jury.[12] Furthermore, "[a]rgumentative questions not only fail to elicit facts and to contribute to the ascertainment of truth * * * but also they invade the province of the jury, which is to determine the facts." *Mattfeld v. Nester*, 226 Minn. 106, 127, 32 N.W.2d 291, 305–06 (1948). But, as the Advisory Committee's Note to Federal Rules of Evidence 704 indicates, the abolition of the former "ultimate issue" rule was specifically meant to allow physicians to testify as to cause of death. In Minnesota, the law has long been that medical experts are permitted to give their opinions upon the very issue which the jury will have to decide. *Krueger v. Knutson*, 261 Minn. 144, 159, 111 N.W.2d 526, 536 (1961). The manner and scope of cross-examination, which generally should be wide-ranging, rests within the discretion of the trial court. *Mattfeld*, 226 Minn. at 126, 32 N.W.2d at 305. Because Dr. Plunkett is a forensic pathologist whose professional responsibility is to determine cause and manner of death based upon the condition of the body as well as the surrounding circumstances, the trial court did not abuse its discretion by failing to limit this cross-examination. *State v. Saldana*, 324 N.W.2d 227 (Minn.1982), does not require a different conclusion because the expert was not a physician and the case involved rape, a circumstance under which expert testimony is treated as *sui generis*. 324 N.W.2d at 231–32.

7. The defense, finally, urges that the prosecutor's final argument constituted prosecutorial misconduct.

At the end of his closing argument, the prosecutor made the following statement:

> Ladies and gentlemen, much has been made of the fact we should have better law enforcement in this country. Why aren't the authorities doing so and why don't the police do something. The fact of the matter is, the police can't do anything to enforce the law, all they can do is gather evidence. I as a prosecutor can't do anything to enforce the law, all I can do is present evidence to a jury of 12 such as yourselves. If we are to have law enforcement in this country it has to come with the fair and impartial deliberations of a jury such as yourselves. Ladies and gentlemen of the jury, the evidence proves this defendant's guilt in this case and I ask that you return a verdict of guilty as charged. Thank you.

These words and their substance are practically identical to the argument which this court declared to be clearly improper in *State v. Brown*, 348 N.W.2d 743 (Minn. 1984).[13] Other cases have also objected to the use of closing arguments with such "law and order" themes. *See State v. Threinen*, 328 N.W.2d 154, 157 (Minn. 1983); *State v. Clark*, 291 Minn. 79, 81–82, 189 N.W.2d 167, 169–70 (1971).

In *Brown*, however, this court said that "a defense counsel's failure to object or to request curative instructions normally weighs heavily in our decision whether or not to reverse on the basis of prosecutorial misconduct in closing argument." 348 N.W.2d at 747. In the instant case, defense counsel failed to do either. Defense

---

**12.** Minn.R.Evid. 704 provides: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

**13.** The *Brown* case involved the same prosecuting attorney. We realize that he had not had the benefit of our opinion when this case was tried, and we trust he will not use such language again.

counsel argues that to object to such a closing argument is to draw further attention to it. We conclude that a corrective instruction from the bench would have obviated any of the prejudicial effect of the misconduct on the jury's verdict. Although the statement in question was regarded as serious misconduct, given the strong evidence of defendant's guilt, the error was held harmless. There is strong circumstantial evidence of Bourke Langley's guilt. In addition to the details surrounding Rose's death, the wiretapping of her telephone conversations, the warnings that she had better not see Larry again, and Bourke's discussion with his friend Jerry the evening before Rose's death firmly establish malice and motive.

Bourke's lies about not having beaten Rose since the California incident were impeached by his own witnesses. Why would counseling or restraining orders have been necessary if Bourke had learned in the Spousal Abuse Project to control his violent temper? Finally, Bourke himself admitted the extent to which he was disturbed by Rose's relationship with Larry. His frustration and suspicion was extreme enough for him to have wiretapped her telephone.

The timing of his discovery that Rose was having an affair and Rose's subsequent death contribute to creating the rational inference that Bourke killed Rose Langley. Any error committed by the giving of the "law and order" closing argument is harmless in the face of all of the evidence of guilt. We affirm the jury's finding that Bourke Langley is guilty of murder in the second degree.

Affirmed.