**STATE of Minnesota, Respondent,**

v.

**Emil MOSLEY, Appellant.**

**No. C8-87-237.**

Court of Appeals of Minnesota.

Oct. 27, 1987.

Review Denied Dec. 22, 1987.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Beverly J. Wolfe, Asst. County Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Bradford W. Colbert, Asst. State Public Defender, St. Paul, for appellant.

Considered and decided by WOZNIAK, P.J., and FOLEY and CRIPPEN, JJ., with oral argument waived.

## OPINION

FOLEY, Judge.

■ Following a jury trial, appellant Emil Mosley was found guilty of second degree murder and sentenced to the presumptive sentence of 205 months. Mosley appeals the judgment of conviction. We affirm.[1]

---

1. On September 9, 1987, appellant filed a supplemental pro se brief. On September 14, 1987, respondent moved to strike appellant's supplemental brief, arguing it was improper for appellant to raise three issues not previously argued or briefed. On September 24, 1987, appellant filed his response, arguing his supplemental brief was filed according to the informal practice recognized by *Case v. State,* 364 N.W.2d 797 (Minn.1985).

Under the circumstances, where appellant's supplemental brief was filed after we considered and decided this case and after respondent's opportunity to respond to appellant's brief had expired, we decline to consider appellant's supplemental brief.

## FACTS

On March 7, 1986, appellant called 911 to report his son, Jason Mosley, was having trouble breathing. When Officer Miller arrived at the scene, he found fourteen month old Jason lying on his back in the living room. Miller testified there was a dark red abrasion just below Jason's lower lip, small bruises on his cheek and small bruises on his chest. Finding that Jason had no pulse and was not breathing, Miller immediately began CPR.

Officers Calistro and Grapentine arrived at the scene along with fire and ambulance personnel. Calistro testified appellant told the officers he left Jason with a babysitter. When he returned home, he found the apartment door open and Jason unattended.

While at the hospital, appellant told the officers he met the babysitter, a white female named Susan, through Al Goudy, a friend of his. According to appellant, Susan arrived at his apartment about 7:00 p.m. and he left at about 7:30 to go to work at Personnel Contractors Incorporated (PCI). Perry Johnson, assistant manager of PCI, testified he had no record of appellant working at PCI during February or March 1986.

Appellant claims he worked until midnight. When he returned home at 9:00 a.m., he found the front door open and Jason unattended. Initially, Jason seemed fine, but subsequently, he became listless and had difficulty breathing. When Jason did not respond to appellant's efforts to revive him at about 10:30 a.m., appellant called 911.

Appellant told the police he had Susan's phone number at his apartment. On the way, they stopped at Goudy's house. Goudy testified he never introduced appellant to a white female named Susan. Appellant was unable to locate Susan's phone number at his apartment.

Appellant was then taken to the police station for his statement. Again appellant repeated the story about the babysitter whom he suspected hurt Jason.

The day after appellant's arrest, Sgt. Nelson told appellant he didn't believe his story. When Nelson suggested that appellant may have inadvertently hurt Jason, appellant "kind of shrugged and sat back in his chair and said, 'All right, it was an accident.'"

Appellant told Nelson that Susan came to his apartment, but left about 11:00 p.m. After Susan left, appellant played with Jason, bouncing Jason on his knee while laying on his back. Jason fell, hit appellant's foot, and started having difficulty breathing. Appellant knew Jason was hurt so he laid him in his crib and went to sleep on the floor next to the crib.

At 4:00 a.m. appellant noticed Jason's breathing was getting worse, so he took him out of the crib and laid him on the floor. At 10:25 a.m. appellant called 911.

The emergency room attending physician testified Jason had bruises of different colors on his chest, indicating they occurred at different time periods.

Jason died at approximately 3:25 p.m. during emergency surgery, which was performed to repair Jason's lacerated liver. The surgeon who operated on Jason testified the liver injury was "massive and quite severe" and that the type of injury which Jason received is usually caused by "great force." The surgeon further testified he was confident the degree of force that caused the Jason's liver injury was not caused by CPR.

The autopsy stated Jason died "as a result of a hemorrhage from a blunt force injury to the abdomen sustaining a liver laceration." Chief medical examiner Dr. Peterson testified appellant's story of Jason slipping while he was bouncing Jason on his knee did not "fit the degree of injury" to the liver. Dr. Peterson testified the injury to Jason's liver was "very substantial" and went "deeply into the tissue" and was "associated with severe impacts, not just inadvertent impacts or impacts caused by falling short distance." Dr. Peterson further testified he had seen severe liver injuries like Jason's caused by automobile accidents and by a horse kicking someone in the abdominal area. Finally,

Dr. Peterson testified properly administered CPR would not have caused Jason's fatal liver injury.

Kim Bousal, who had know appellant for a number of years, testified she babysat Jason on March 6, 1986. Bousal testified she did not notice any bruises on Jason.

During trial, a substantial amount of evidence was introduced concerning appellant's relationship with Jason. At birth, Jason was referred to Child Protection Services because of Jason's mother's mental health. Jason was subsequently placed in foster care with Norma McDuffie.

McDuffie testified appellant never missed a visit, was always on time for his visits and that the quality of appellant's visits were "very good". When Jason was about five months old, appellant began taking him on overnight visits, which continued until Jason was placed in appellant's care on September 27, 1985. McDuffie further testified she saw Jason after he was placed with appellant. In all of McDuffie's contact with appellant, she never saw appellant mistreat Jason.

Greg Kowalski, a Child Protection Services social worker, testified appellant told him parenting was harder than he thought. During a January 27, 1986, visit, Kowalski noticed bruises on Jason's head. Appellant explained Jason had banged his head on a busy box in his crib. During another visit, Kowalski testified he saw appellant lift Jason up by one arm and push Jason down to keep him from standing up.

The next day, Jason was seen by pediatrician Dr. Singer for a routine check-up. Dr. Singer testified Jason had two small bruises on his head. Appellant explained Jason had fallen against his crib. Dr. Singer testified the bruises were consistent with Jason hitting his head on the crib and that it was normal for children to have those kind of bruises.

On February 28, 1986, Kowalski noticed a larger bruise on Jason's forehead and a black and blue mark by his left eye. Appellant explained Jason had fallen out of his chair at a restaurant. However, Hennepin County Medical Center has no record of Jason being treated on that day.

Appellant told Sgt. Nelson Jason was injured when he fell out of a wooden high chair at a restaurant. Both the manager and the assistant manager testified at trial that the restaurant does supply high chairs with safety straps, but they are metal, not wooden. Neither manager received a report of a child falling out of a high chair on February 26, 1986.

Patricia Warren, an employee at the restaurant, testified she had a conversation with appellant at the restaurant sometime at the end of February 1986. During her break, Warren was at the same table as appellant, playing with Jason and talking with appellant. Warren testified appellant hit Jason's hand three or four times very hard. Warren further testified appellant and Jason left the restaurant before she finished her break and that she never saw Jason fall out of the high chair.

Goudy testified appellant "was a little handsy" with Jason and would swear and yell at Jason. He also saw appellant hit Jason on the mouth. Goudy testified he thought appellant hit Jason because of his lack of control or frustration. In Goudy's opinion, appellant would never intentionally hurt Jason.

Ruth Williams testified she took care of Jason on March 3, 1986. When Williams noticed the bruise on Jason's head, appellant explained Jason had fallen out of bed. Further, Williams testified when appellant returned to pick Jason up, he hit him on the face with his open hand.

Barbara Leake, Bousal's mother and Williams' mother-in-law, testified she had known appellant for seven or eight years and that she had never seen appellant mistreat Jason.

Sister Marie Belanger, director of the Free Store in Minneapolis, testified she saw appellant and Jason about three times a week and that she never saw appellant treat Jason with anything but kindness.

### ISSUES

1. Did the trial court err in its instructions to the jury?

2. Was the evidence sufficient to sustain appellant's conviction of second degree murder?

### ANALYSIS

1. Appellant contends the trial court's jury instructions incorrectly defined the intent required for the underlying felony of first or third degree assault. It is appellant's position the felony assault offenses require proof, in addition to "intentionally inflicting bodily harm," of specific intent to inflict either "great" or "substantial" bodily harm.

■ On review of claims of error in jury instructions, the instructions must be considered as a whole. *State v. Larson*, 281 N.W.2d 481, 485 (Minn.1979), *cert. denied*, 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). Here, the jury was instructed that appellant was guilty of second degree murder if he caused Jason's death "without intent to cause the death of any person, while committing the felony offense of Assault in the First Degree or Assault in the Third Degree." The jury was further instructed as follows:

Assault is defined as doing an act with intent to cause fear in another person of immediate bodily harm or death. Or, *intentionally inflicting or attempting to inflict bodily harm* upon another.

Assault in the First Degree is defined as assaulting another person and *inflicting great bodily harm.* The elements of Assault in the First Degree in this case are as follows:

First, defendant assaulted Jason Mosley. This means that defendant *intentionally inflicted bodily harm* upon Jason Mosley.

Second, defendant *inflicted great bodily harm* which creates a high probability of death or which causes serious permanent disfigurement, or which causes permanent or protracted loss or impairment if the function of any part of the body, or other serious harm.

\* \* \* \* \* \*

Assault in the Third Degree is defined as assaulting another person and *inflict-*

*ing substantial bodily harm.* The elements of Assault in the Third degree are as follows:

First, defendant assaulted Jason Mosley. This means that the defendant *intentionally inflicted bodily harm* upon Jason Mosley.

Second, defendant *inflicted substantial bodily harm* means bodily harm on Jason Mosley. Substantial bodily harm means bodily harm which involves a temporary but substantial disfigurement or which causes a temporary but substantial loss or impairment of the function of any bodily member or organ, or which causes a fracture of any bodily member.

(Emphasis added.)

■ Appellant failed to object to the jury instructions at trial. Failure to raise this issue below waives consideration on appeal. *See State v. Edwards*, 343 N.W.2d 269, 277 (Minn.1984) (defendant's failure to object to self-defense instruction at trial "forfeited his right to have the issue considered on appeal").

■ Appellant argues that even though he did not object at trial, he is still entitled to raise this issue because it relates to an error of fundamental law. *State v. Malaski*, 330 N.W.2d 447 (Minn.1983). When an erroneous jury instruction is given a new trial should be granted unless it appears, as a matter of law, that the jury's determination is correct. *Becker v. Alloy Hardfacing & Engineering Co.*, 401 N.W.2d 655, 660 (Minn.1987).

■ The record reveals that throughout appellant's trial, the issue was whether Jason's liver injury was caused by assault or by improperly administered of CPR. Defense counsel never even suggested that if appellant had assaulted Jason, he only intended to inflict bodily harm rather than "substantial" or "great" bodily harm. We also note the jury instruction were almost identical to the CRIMJIG instructions for first and third degree assault. *See* CRIM-JIG 13.01, 13.04, 13.08. We hold there was no error in the jury instructions.

2. Appellant contends the evidence was insufficient to sustain his conviction for

second degree murder because the state presented only circumstantial evidence, which he claims, was entirely consistent with his innocence.

In reviewing a claim of insufficiency of the evidence, we must make a thorough review of the evidence to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985). We do not retry the facts. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978). Instead, we must view the evidence most favorable to the state and assume the jury believed the state's witnesses and disbelieved any contradictory evidence. *Id.*

Circumstantial evidence in a criminal case is entitled to the same weight as any other kind of evidence as long as the circumstances proved are consistent with the hypothesis that appellant is guilty and inconsistent with any rational hypothesis except that of his guilt. *State v. Morgan*, 290 Minn. 558, 561, 188 N.W.2d 917, 919 (1971).

Appellant was convicted of second degree murder in violation of Minn.Stat. § 609.19(2) (1984), which provides a defendant is guilty of second degree murder if s/he:

Causes the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense other than criminal sexual conduct in the first or second degree with force or violence.

The state was required to prove, beyond a reasonable doubt, that appellant was guilty of second degree murder. This required a finding that appellant intended to commit either first or third degree assault. There was evidence to support a finding of either first or third degree assault.

Appellant argues the evidence was equally consistent with the possibility that Jason's death was caused by accidental suffocation and then improperly applied CPR. Appellant's hypothesis is not supported by the evidence.

Medical testimony established that there was no evidence of an airway obstruction or seizure. Further, appellant never claims he accidentally suffocated Jason. More importantly, appellant's hypothesis would require a finding that CPR was improperly performed. There is no such evidence. Consequently, appellant's theory as to how Jason's liver injury occurred is not a rational hypothesis and we reject it, as did the jury.

The weight of the evidence, viewed in a light most favorable to the prosecution, is inconsistent with any rational hypothesis except that of defendant's guilt. *See State v. Langley*, 354 N.W.2d 389, 396 (Minn. 1984) (the weight of the circumstantial evidence negated the possibility of accidental death); *State v. French*, 402 N.W.2d 805, 808 (Minn.Ct.App.1987) (circumstantial evidence did not rationally suggest that victim or a third party caused victim's death).

**DECISION**

Affirmed.